UNITED STATES of America, and Interstate Commerce Commission, Petitioners,

v.

The GREYHOUND CORPORATION et al., Respondents.

UNITED STATES of America, and Interstate Commerce Commission, Petitioners,

v.

The GREYHOUND CORPORATION, and Greyhound Lines, Inc., Respondents.

Civ. A. No. 69–C–1148, Crim. No. 71 CR 924.

United States District Court,
N. D. Illinois, E. D.

Jan. 22, 1974.

John E. Sarbaugh, Joel Davidow, U. S. Dept. of Justice, Chicago, Ill., Lubomyr M. Jachnycky, I. C. C., Bernard A. Gould, Director, Bureau of Enforcement, I. C. C., Bernard M. Hollander, Chief, Judgments & Judgment Enforcement Section, Antitrust Div., U. S. Dept. of Justice, Robert S. Turkington, Chief, Court Enforcement Branch, I. C. C., Washington, D. C., for petitioners.

George Christensen and Edmund J. Kenny, Winston & Strawn, Chicago, Ill., William W. Schwarzer and John R. Reese, McCutchen, Doyle; Brown & Enersen, San Francisco, Cal., Robert J. Bernard and W. L. McCracken, Phoenix, Ariz., for respondents.

## MEMORANDUM AND ORDER ON ISSUE OF SANCTIONS FOR CRIMINAL AND CIVIL CONTEMPT

ROBSON, Chief Judge.

On June 27, 1973 this court issued its memorandum and order finding the corporate respondents in criminal contempt for violation of paragraphs 1, 3, 4, 5, and 6 of the three-judge court order dated February 5, 1970.[1] This court also found the corporate and individual respondents in civil contempt for continuing violations of paragraphs 3, 4, and 5. The court found neither criminal nor civil contempt as to paragraphs 2, 8, and 9. Having made its findings on the issue of contempt, the court must now direct its attention to the issue of appropriate criminal and civil sanctions.

## I. SANCTIONS FOR CRIMINAL CONTEMPT

The purpose of a criminal contempt proceeding is to vindicate the authority and dignity of the court. While there is no precise limit upon the amount of fine a district court may impose in punishment for criminal contempt, Brown v. United States, 359 U.S. 41, 79 S.Ct. 539, 3 L.Ed.2d 609 (1958), the Supreme Court has elaborated standards to guide district judges in determining the amount of monetary penalty which is appropriate. In accordance with those guidelines the court hereby fines the Greyhound Corporation $100,000 and Greyhound Lines, Inc., $500,000 for their criminal contempt.

In United States v. United Mine Workers, 330 U.S. 258, at 303–304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947), the Court stated:

> "In imposing a fine for criminal contempt, the trial judge may properly take into consideration the extent of the willful and deliberate defiance of the court's order, the seriousness of the consequences of the contumacious behavior, the necessity of effectively terminating the defendant's defiance as required by the public interest, and the importance of deterring such acts in the future. Because of the nature of these standards, great reliance must be placed upon the discretion of the trial judge.

> \* \* \* \* \* \*

> "It is a corollary of the above principles that a court which has returned a conviction for contempt must, in fixing the amount of a fine to be imposed as a punishment or as a means of securing future compliance, consider the amount of defendant's financial resources and the consequent seriousness of the burden to that particular defendant."

1. The order of the three-judge court is reported at 308 F.Supp. 1033 and this court's memorandum on the issue of contempt is reported at 363 F.Supp. 525.

Applying these criteria to the present case the court must first focus on the extent of Greyhound's willful and deliberate defiance of the order.

█ As noted in this court's lengthy Memorandum and Order of June 27, 1973, Greyhound displayed a contemptuous reluctance to even commence compliance with the order of February, 1970. Much of Greyhound's real compliance did not occur until months after the contempt petitions were filed, and with respect to some paragraphs Greyhound had not complied even by June, 1973. In light of the fact that the three-judge court had ordered respondents to do 'substantially the same things which they had been ordered to do by the ICC in late 1968, there was absolutely no reason why compliance could not be effected soon after Greyhound had exhausted its right of judicial review of the ICC order. Once that avenue of relief was closed, Greyhound had an affirmative duty to immediately comply with the injunction of the three-judge court. This court's Memorandum of June 27, 1973 abundantly illustrates that Greyhound failed to fulfill its obligations to this court in a timely and expeditious manner. Rather than immediately comply with all elements of the order, Greyhound either tried to smokescreen its non-compliance, or it acted under narrow interpretations of the order, or it simply did nothing. However, the law is clear that a corporation may be found guilty of criminal contempt for reckless indifference to achievement of compliance, for unconscionable delay, and for acting under twisted interpretations of an order, even though it may avoid the appearance of direct defiance, United States v. Gamewell Co., 95 F. Supp. 9, 13 (D.Mass.1951), United States v. Custer Channel Wing Corp., 247 F.Supp. 481, 496 (D.Md.1965), aff'd. 376 F.2d 675 (4th Cir. 1967)

In determining the extent of Greyhound's willful defiance of the order, the court recognizes Greyhound's record of purposeful non-action, protracted resistance, and emasculating interpretations of the order. The court also notes Greyhound's "paper compliance" program and the reluctance with which Greyhound's top management became actively involved in securing compliance with the order. All of this suggests that Greyhound's failure to comply with certain parts of the order was deliberate. Top level executives could not remain aloof and expect lower-echelon employees to comply with the order. This is particularly true when many of those employees were not even made aware of the existence of the order until after the filing of the contempt petitions.

Under *Mine Workers*, the second factor the court must consider is the seriousness of the consequences of Greyhound's contumacious conduct. Two direct consequences flowed from Greyhound's contempt: first, Greyhound's only competitor in the Pacific Northwest was threatened with destruction and, second, the evidence reveals that efficient bus service in the Pacific Northwest was disrupted by Greyhound's conduct. There is no doubt that large numbers of bus travelers were inconvienced by Greyhound's contempt.[2]

█ The third factor under *Mine Workers* relates to the element of deterrence. Materials submitted by Greyhound to date indicate that a large fine is not needed to terminate Greyhound's contempt. It appears that Greyhound has taken substantial steps toward achieving full compliance with the order.[3] However, the court must also

2. The court finds support for this in the fact that many of Greyhound's actions that were found to be in violation of the order, were also found to be in violation of the antitrust laws in Mt. Hood Stages, Inc., d/b/a Pacific Trailways v. Greyhound Corp. et al., Civ. No. 68–374 (D.Or.1973). The jury found that MH sustained losses of nearly $957,800 between February 5, 1970 and March 15, 1973, approximately the period of violations in the contempt case.

3. See Greyhound Memorandum of Compliance dated July 30, 1973 and Affidavit of John E. Atkins dated October 11, 1973.

consider the deterrent effect its fine might have on other corporations which may be tempted to flout a federal court order. Litigants must know that there is no profit to be made in defying court orders and that in the long-run compliance will cost less than defiance. Thus, the court is constrained to impose a substantial fine—one that will have more than an "inconsequential effect"—upon Greyhound. *Cf.* United States v. R. L. Polk, 438 F.2d 377 (6th Cir. 1971).

■■■ This court is of the opinion that a total fine of $600,000 is not beyond the ability of the corporate respondents to pay. The Greyhound Corporation's total earnings in 1970, 1971, and 1972 approximates $192,886,440. Greyhound Lines, Inc., the bus operating subsidiary, earned approximately $105,772,840 over the same period.[4] While Greyhound's size and profits were irrelevant in determining its guilt or innocence, the extent of its financial resources is relevant not only in determining its ability to pay, but also in estimating the amount of fine which will be sufficient to deter Greyhound, or a company of similar size, from committing future acts of criminal contempt.

Greyhound contends that its violations of the order were not willful in the sense that it knew its actions were in violation of the order. Rather, Greyhound argues that it was found to be in criminal contempt for pursuing plausible, but mistaken courses of action. In light of the history of this case, the court is of the opinion that Greyhound's position is not well founded.

■■■ The ICC entered a cease and desist order against Greyhound in October, 1968. After exhausting its right of judicial review, Greyhound was left subject, not only to the ICC cease and desist order, but also this court's injunction. From the moment Greyhound left the courthouse steps, it had an immediate duty to obey the commands of those orders. That it did not is evident from the court's Memorandum and Order of June 27, 1973. Important in those findings was the fact that the ICC and Mt. Hood had warned and advised Greyhound in specific terms that Greyhound's compliance with the order was not satisfactory. Given this background and Greyhound's unwillingness to comply with the ICC cease and desist order, the contempt proceeding was inevitable. In sum, Greyhound knew, or should have known, that the course upon which it was proceeding was in violation with both the letter and spirit of the order.

## II. ISSUE OF CIVIL RELIEF

On June 27, 1973 the court found that Greyhound was in civil contempt for continuing violations of Paragraphs 3, 4, and 5 of the February 5, 1970 order. After entry of June 27, 1973 findings of contempt, Greyhound finally realized that full compliance with all provisions of the order was imperative. Greyhound's enactment of meaningful measures to achieve compliance has obviated the need at this time for further coercive orders. However, the court must emphasize that in the event that Greyhound's efforts to achieve compliance should slacken, or should the present atmosphere of cooperation disintegrate, the court shall consider the imposition of further civil sanctions.

From Respondents' Statement Re Compliance dated July 30, 1973 it is apparent that they are attempting to correct the most glaring deficiencies of its compliance program.[5] In addition, Grey-

---

4. Greyhound's Annual Report for the year 1970 indicates that the company achieved consolidated earnings of $55,495,977 on a sales volume of $2,753,165,430. In 1971, Greyhound's earnings increased to $70,542,463 on total revenues of $2,626,358,000. In 1972, Greyhound earned approximately $66,848,000 on sales of $2,912,600,000. With respect to Greyhound Lines, Inc., an examination of its Annual Report for 1970, Form A, indicates that it earned $32,099,002 on operating revenues of $427,800,974. In 1971, the bus line earned $35,516,618 on operating revenues of $443,530,955. In 1972, it earned $38,156,820 on revenues of $462,202,157.

5. Greyhound has appointed a full-time executive without prior connections with the violations to supervise compliance. In addition, it has (1) sent bulletins nationwide which

hound and MH negotiators are meeting to resolve problems relating to Paragraph 3 of the order.[6]

 To insure that the court will be apprised of further compliance efforts the court finds it necessary and appropriate that respondents make reports of these efforts and results every six months for the next five years. After each report the government shall be granted 40 days to submit its comments and observations on the substance of Greyhound's report. Should MH want to report on Greyhound's compliance efforts, it should notify the government, which will include MH's report with its own. In addition, the court is of the opinion that the Department of Justice staff members involved in this case should be granted visitorial and document examination rights so that they may further monitor Greyhound's compliance efforts.

 Finally, there is the issue of awarding attorneys fees to the government. It is well settled law that upon a finding of civil and/or criminal contempt, a court may award to the complainant, as part of the civil relief, a sum of money to defray the litigation expenses which the complainant had to incur in order to prosecute the contempt. Lance v. Plummer, 353 F.2d 585 (5th Cir. 1965). It is equally well settled that such relief is available not only to private plaintiffs but also to governmental agencies, N. L. R. B. v. Local 825 I.

U. O. E., 430 F.2d 1225 (3d Cir. 1970). The government estimates that the value of the Department of Justice attorney's services in this case approximates $10,000. The court shall award the government its attorney's fees. However, Department of Justice Attorneys must file, within 30 days, affidavits which detail the number of hours expended and the grade level at which such hours were worked. The court understands that the attorneys for the ICC do not request any award of attorney fees inasmuch as that agency has continuing statutory obligations to supervise the bus industry.

## III. ISSUE OF CIVIL RELIEF VIS-A-VIS MT. HOOD

In addition to the government's request for civil relief, the court has before it the Intervenor's, MH, request for civil relief such as additional injunctive measures, damages, and attorney fees.

 Although the court has the power to grant additional injunctive relief as a remedial sanction, the court finds such measures are unnecessary at this time. The court's position is based upon the present efforts of Greyhound to fully comply with the letter and spirit of the original injunction. (See discussion in Section II of this Memorandum.) There is an area of concern, however, with respect to Greyhound's use of language in its instructional bulletins to the effect that Greyhound agents need not promote or encourage passengers to

give *specific* instructions on when and how to quote Mt. Hood's service; (2) they have stated in the bulletins that there is a court order and finding of contempt, they have quoted the order, and they have told employees that compliance will be policed by Greyhound and that failure to comply may result in discipline; (3) they have instituted a meaningful program of telephone checks based on questions and answers utilized by MH and the ICC, and they are keeping a record of answers received and whether those answers are correct or incorrect; (4) they have hired Pinkerton, Inc., as an independent auditing agency to police their employees' compliance. Its findings are to be reported simultaneously to the court, the parties, and to Greyhound.

6. The government has advised the court that its interview with MH officials and an examination of Greyhound documents indicates that respondents are negotiating in good faith to improve connections between Greyhound and MH. The 2½ hour delay at the Dalles has been eliminated and a meal stop has been changed to create a new and useful connection at Biggs. In addition, Greyhound is permitting MH buses to pickup and discharge interline passengers at Greyhound terminals at Salt Lake City and Portland. Although some problem remains with respect to the Burley connection, serious and substantial difficulties raised by Greyhound appear to be genuine and the parties are working to resolve them.

use MH's services. This is a fair and accurate statement of the limit on Greyhound's obligations under the order. Nevertheless, Greyhound must not use the court's remarks out of context and such language should not be used in a bulletin unless it also makes very clear just what the agents' obligations are under the order. Such an instruction by itself in a Greyhound compliance directive may serve to inhibit the quotation of services and may result in some quotations which are not in the best interests of the traveling public.

With respect to the problem of Greyhound not quoting MH service to passengers originating in Portland and Salt Lake City, the court is of the opinion that Greyhound need not voluntarily give such quotation, but it must give such information accurately if the passenger requests it. The services of Greyhound and MH between Portland and Salt Lake City are directly competitive. Tickets are sold at rival terminals within a block or two of each other for travel over a nearly identical route. In sum, nothing in the history of these proceedings suggests that Greyhound has this obligation and the court shall not impose it now. Thus, MH's request for amendments to, or changes in, the original injunction are hereby denied.

As additional relief, MH has asked the court to order Greyhound to: (1) advise their passengers of MH's connecting services; (2) have their drivers distribute schedule cards to passengers; (3) have passengers sign "diversion permits"; (4) revise its ticket tear map so that it shows Greyhound connections with Greyhound Lines of Canada, Inc.; and (5) take steps to insure that Pinkerton's Inc. conducts an independent check of Greyhound's compliance. MH also has requested the court to grant it visitorial rights and the right to file periodic reports on Greyhound's compliance program. Each of these requests shall be denied.

The court is informed that Greyhound has revised its depot announcements and that passengers are now advised of ticket honoring arrangements between Greyhound and MH. There is no evidence which suggests that Greyhound drivers are misquoting MH service so as to warrant the court ordering Greyhound to distribute schedule cards. Nor is there any basis for requiring Greyhound to obtain diversion permits from passengers. As for Pinkerton, the court is satisfied that it is independent and that it will reliably measure Greyhound's compliance. Pinkerton was retained by Greyhound on the government's recommendation. All parties and the court will receive the results of their work at the same time as Greyhound. When Pinkerton compliance checks are distributed, they are accompanied by an affidavit of the appropriate Pinkerton agent attesting generally to the independent procedures used in monitoring Greyhound's quotations. In addition, the ICC's Bureau of Traffic is reviewing Pinkerton's work with respect to its procedures and completeness.[7]

As for MH's request for visitorial rights, there is no legal basis for granting such a request. In fact, the granting of such a request may be illegal under existing law, 49 U.S.C. § 322(d). As for the revision of the Ticket Tear Map, Paragraph 6 of the order does not require Greyhound to add the lines of other carriers to its Ticket Tear Map.

Finally, the court denies MH's request that it be permitted to file periodic reports with the court in Greyhound's compliance. The court is of the

---

7. Mr. Niskanen of MH was apparently dissatisfied with the Pinkerton checks, but it appears that most of the criticisms he made have been considered and Pinkerton has corrected certain matters. The court believes the better practice in this regard would be for MH to notify Pinkerton and Greyhound of any suggested changes and if the matter can not be worked out, then MH should contact the government, which will mediate the dispute.

opinion that it would be preferable to have MH participate in the government's periodic reports. Attorneys for the government and MH appear to work amicably together and the court is of the opinion that this entire matter could be dealt with most efficiently if MH's reports were contained within those of the government.

 While the court clearly has the power to award MH damages based on expenses directly related to the contempt action and damages for injury to its business as a direct result of the contempt, the court shall not award any damages to Mt. Hood. In Mt. Hood Stages, Inc. v. The Greyhound Corp. et al., Civ. No. 68–374, (D.Or.1973), the jury found Greyhound guilty of three violations of the antitrust laws. The court entered a judgment in MH's favor in the sum of $13,146,090 and for its reasonable attorneys fees. Greyhound's motions for a new trial and a judgment notwithstanding the verdict were denied by the court on November 29, 1973. In light of the fact that MH was so eminently successful, the court is of the opinion that the antitrust verdict will adequately compensate MH for any damages it may have also suffered as a result of Greyhound's contempt. This is particularly true since many of the same acts of Greyhound that were found to be contemptuous were also involved in the private antitrust case.

The court is aware that MH's verdict and judgment are subject to appeal, but the court cannot leave this case open on the chance that at some uncertain time in the future it may be reversed. Furthermore, there is some question as to MH's ability to prove that it would be entitled to damages if the antitrust judgment is reversed.

Finally, MH's request for attorneys' fees shall be denied. In support of its request MH submitted two affidavits. Because of inconsistencies in the two affidavits, the court must look askance at the latter one which claims about 205 hours for work in the contempt proceeding. But regardless of the affidavits, the court is impelled to deny MH's request inasmuch as it will receive its attorneys fees for work done in connection with the private antitrust suit. Work done in the contempt case by MH presumably was important, and related to, its preparation of the private antitrust case. Compensation received in that case should be adequate to reward MH's attorneys for their work.

In accordance with the foregoing Memorandum, it is hereby ordered that:

(1) Respondents shall provide to the court and the parties, at least *once every six months for the next five years,* a report, with underlying documentation, describing their compliance efforts and success in achieving compliance with Paragraphs 3, 4, and 5 of this Court's Order of February 5, 1970. At the conclusion of the five year period, respondent and the parties shall file with the Court written statements concerning whether a continuation of the reporting requirements of this provision is appropriate. After each six month report by Greyhound, the ICC, Department of Justice, and Mt. Hood may file a consolidated response within 40 days.

(2) Upon request of the Department of Justice or the Interstate Commerce Commission, and having been provided with reasonable notice, respondents shall make available to the staff of the Department of Justice or the Interstate Commerce Commission all files and underlying documents relating to compliance with this Court's Order of February 5, 1970, and shall allow such staff members access rights to files and facilities, and interviews with their personnel or their agents or independent contractors, reasonably related to an investigation of respondents' compliance with the Order.

(3) All of the relief requested by Intervenor Mt. Hood shall be, and the same is hereby, denied.

(4) Greyhound's motion for an order finding it in compliance with Paragraphs 3, 4, and 5 of the February 5,

1970 order shall be, and the same is hereby, denied. After the filing of the first six month compliance report, the court shall, upon motion of Greyhound, reconsider such a motion.

(5) The government submit affidavits in support of its request for attorneys' fees within 30 days of this Memorandum.

(6) The Greyhound Corporation pay to the plaintiff within 30 days a fine of $100,000 to be deposited with the Clerk of the Court, for its criminal contempt of Paragraphs 1, 3, 4, 5, and 6 of the three-judge court order dated February 5, 1970.

(7) Greyhound Lines, Inc. pay to the plaintiff within 30 days a fine of $500,000, to be deposited with the Clerk of the Court, for its criminal contempt of Paragraphs 1, 3, 4, 5, and 6 of the three-judge court order dated February 5, 1970.