# GREYHOUND CORP. ET AL. v. MT. HOOD STAGES, INC., DBA PACIFIC TRAILWAYS

No. 77–598.   Argued April 24, 1978—Decided June 19, 1978

BLACKMUN, J., delivered the opinion for a unanimous Court. BURGER, C. J., filed a concurring opinion, *post*, p. 337.

*John R. Reese* argued the cause for petitioners. With him on the briefs were *Richard C. Brautigam, James H. Clarke,* and *Keith A. Jenkins.*

*Eugene C. Crew* argued the cause for respondent. With him on the brief were *Michael N. Khourie, Bruce M. Hall,* and *Donald A. Schafer.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

This case presents the issue whether § 5 (i) of the Clayton Act, as amended, 88 Stat. 1706, 90 Stat. 1396, 15 U. S. C. § 16 (i) (1976 ed.),[1] operates to toll the running of the Act's statute of limitations[2] from the date on which the United States filed a petition for leave to intervene in an Interstate Commerce Commission proceeding previously instituted by the plaintiff.

I

Petitioner Greyhound[3] and respondent Mt. Hood Stages, Inc. (doing business as Pacific Trailways), are motor common

---

[1] Section 5 (i), as set forth in 15 U. S. C. § 16 (i) (1976 ed.), provides:

"Whenever any civil or criminal proceeding is instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws, but not including an action under section 15a of this title, the running of the statute of limitations in respect to every private or State right of action arising under said laws and based in whole or in part on any matter complained of in said proceeding shall be suspended during the pendency thereof and for one year thereafter: *Provided, however,* That whenever the running of the statute of limitations in respect of a cause of action arising under section 15 or 15c of this title is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued."

[2] Section 4B, 69 Stat. 283, as amended, 15 U. S. C. § 15b (1976 ed.). It provides:

"Any action to enforce any cause of action under sections 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this Act shall be revived by this Act."

[3] Petitioner The Greyhound Corporation is a Delaware corporation that now is a diversified holding company owning, among other assets, all the issued and outstanding capital stock of petitioner Greyhound Lines, Inc., a California corporation. On December 31, 1963, The Greyhound Corporation discontinued its operation of scheduled common carrier bus service and transferred its motor carrier operating rights and properties to Greyhound Lines, Inc., App. 68; cf. *Mt. Hood Stages, Inc.,* 104 M. C. C. 449, 465 (1968). For convenience, we refer to the two corporations collectively as

carriers of passengers and package express and are subject to regulation by the Interstate Commerce Commission (ICC). Greyhound is the largest common carrier by bus in the United States. Mt. Hood is one of Greyhound's comparatively small competitors; it operates over routes in Oregon, Idaho, and Utah. Its principal routes are between Portland, Eugene, and Albany, Ore., in the west, and Salt Lake City, in the east, and between Klamath Falls, Ore., in the south, and Biggs and The Dalles, Ore., in the north. Greyhound's route authority surrounds that of Mt. Hood.

During the period from 1947 to 1956, Greyhound acquired control of eight bus companies operating in the Western United States. See *Mt. Hood Stages, Inc.*, 104 M. C. C. 449, 450, and n. 1 (1968). In the proceedings before the ICC, Mt. Hood opposed four of those acquisitions,[4] alleging that, if the acquisitions were approved, Greyhound could route traffic around Mt. Hood's operations and thereby deprive the public of the most convenient service and jeopardize Mt. Hood's continued existence.[5]

Greyhound successfully contended, however, that the acquisitions were not intended to, and would not, have such consequences. Greyhound represented to the ICC that the acquisitions

> "would not adversely affect connecting carriers; that arrangements with such carriers, including interchange of traffic and open gateways, would be maintained; that it was not the policy of Greyhound to route passengers over circuitous routes; that its agents were instructed to quote the direct route as well as the Greyhound route and give passengers their choice; and that Greyhound had always

"Greyhound." The formal transfer of rights and properties at the end of 1963 has no significance for purposes of this litigation.

[4] Mt. Hood, however, withdrew its opposition to one of these. See *id.*, at 452.

[5] See 555 F. 2d 687, 689 (CA9 1977).

carried MH's schedules in its folders and cooperated in every way to acquaint the public with its service and thus promote additional traffic and business for their lines." [6]

Greyhound also represented to the Commission that it would continue the joint through-bus arrangement with Mt. Hood.[7] As Greyhound had anticipated, the ICC relied on these representations in determining that the proposed acquisitions were in the public interest. *Id.*, at 454–457, 461.

In July 1964, Greyhound terminated the through-bus arrangement with Mt. Hood. On October 7 of that year, Mt. Hood filed a petition with the Commission, pursuant to § 5 (10) (formerly § 5 (9)) of the Interstate Commerce Act,[8] alleging that Greyhound had not lived up to various representations it had made to the ICC and asking the Commission to reopen the acquisition proceedings "for further hearing to consider the necessity of attaching certain terms, conditions and limitations to the privileges therein granted" or, in the alternative, to order Greyhound to divest itself of operations acquired in those proceedings. App. 4. The allegations in Mt. Hood's petition to the Commission were essentially the same as those Mt. Hood made later in this antitrust suit, that

---

[6] This quoted material is from the opinion in the subsequent ICC proceeding instituted by Mt. Hood to reopen the eight acquisition proceedings. *Mt. Hood Stages, Inc.*, 104 M. C. C., at 452. Greyhound's representations in those eight proceedings were so summarized.

[7] This arrangement, initiated in 1949, provided for a through bus from San Francisco to Spokane, using Mt. Hood's bridge route between Klamath Falls and Biggs. The route was shorter by 110 miles and several hours than the all-Greyhound route via Portland. It provided better service to travelers and was profitable for both companies. 555 F. 2d, at 689 n. 3.

[8] Section 5 (10) of the Interstate Commerce Act, as amended, 90 Stat. 63, 66, 49 U. S. C. § 5 (10) (1976 ed.), provides:

"The Commission may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1), (2), or (8), of this section, as it may deem necessary or appropriate."

is, that Greyhound had canceled the through-bus connection, had scheduled connecting service so as to preclude reasonable connections with Mt. Hood, had directed Greyhound's agents and independent joint ticket agents to send traffic around Mt. Hood's routes through use of longer all-Greyhound routes, and had interfered in various ways with the distribution of Mt. Hood's schedules and the quotation of Mt. Hood's rates and services, all with the intent of injuring Mt. Hood. *Id.*, at 10–11.

Slightly more than two months later, on December 14, 1964, the United States petitioned for leave to intervene in the ICC proceeding. *Id.*, at 36. In its petition, the United States stated it had an interest in the proceeding and it urged that the Commission hold a hearing on Mt. Hood's allegations. The Government's petition observed that Mt. Hood's allegations "make a serious charge," *id.*, at 37, but added: "We have no way of knowing whether those of Mt. Hood's allegations which Greyhound denies are true or false; resolution of such controversies is a typical function of a hearing." [9] *Id.*, at 37–38.

On May 27, 1965, the United States and others were granted permission to intervene in the ICC proceeding. *Id.*, at 43. Such permission, however, was on condition that it "shall not be construed to allow intervenors to introduce evidence which will unduly broaden the issues raised in this proceeding." *Ibid.*

After an extensive evidentiary hearing, the examiner resolved all factual issues against Greyhound and recommended entry of an order requiring Greyhound to abide by the representations it had made in the acquisition proceedings. *Mt. Hood*

---

[9] Reiterating this point, the United States' petition stated:

"Mt. Hood's grave allegations, whether true or false, as well· as Greyhound's answer raise issues too serious and important to be disposed of summarily without a full adversary hearing in which allegation and denial can be put to the test of proof and cross-examination." App. 38.

*Stages, Inc.*, 104 M. C. C., at 464–496. On April 5, 1968, Division 3 of the ICC sustained the examiner's findings but deferred entry of a supplemental order to allow voluntary negotiations between the parties. *Id.*, at 462–463.

On July 5, 1968, Mt. Hood filed this action in the United States District Court for the District of Oregon for damages and injunctive relief, alleging violations of the antitrust laws and common-law and statutory unfair competition. App. 46. Mt. Hood's complaint alleged, as to the antitrust violations, that, beginning before 1947 and continuing to the date of the complaint, Greyhound had restrained and monopolized commerce in the carriage by motorcoach of passengers and their luggage between points in the Western United States, including Oregon, Idaho, and Utah, by means essentially the same as those that were the subject of the ICC proceeding. *Id.*, at 49–52.

In the Commission proceeding, meanwhile, the efforts of the parties to agree upon an order failed. The entire Commission therefore entered an order requiring Greyhound to restore the practices and traffic patterns existing when the acquisitions at issue were authorized and, specifically, to eliminate the anticompetitive practices of which Mt. Hood had complained. See *Greyhound Lines, Inc.* v. *United States*, 308 F. Supp. 1033, 1037 (ND Ill. 1970). A three-judge United States District Court denied Greyhound's motion to set aside the Commission's order and granted the counterclaim of the United States and the ICC by the issuance of its own order in similar terms, thus granting injunctive relief. *Id.*, at 1040–1041. Following entry of the District Court's order enforcing the ICC decision, Mt. Hood amended its complaint in this antitrust suit to eliminate its prayer for injunctive relief.[10] App. 57.

---

[10] Greyhound thereafter disobeyed the three-judge District Court's order and was adjudged in criminal contempt. Certain of its officers were adjudged in civil contempt. Fines aggregating $600,000 were imposed. *United States* v. *Greyhound Corp.*, 363 F. Supp. 525 (ND Ill. 1973), and 370 F. Supp. 881 (ND Ill. 1974), aff'd, 508 F. 2d 529 (CA7 1974).

In the present action, interrogatories were submitted to the jury. By its special verdict returned in May 1973, the jury found that, as alleged by Mt. Hood, Greyhound had violated both §§ 1 and 2 of the Sherman Act; that Greyhound had fraudulently concealed these antitrust violations during the period from January 1, 1953, to July 4, 1964; but that Mt. Hood knew or should have known of the violation on December 14, 1960. App. 82. The trial court held that the Government's petition to intervene in the ICC modification proceeding on December 14, 1964, served to toll the statute of limitations under § 5 (i) of the Clayton Act. App. 80. The result was that the Act's four-year period of limitations extended back to December 14, 1960, where it was combined with the fraudulent concealment to create a 20-year damages period.[11] Damages of $13,146,090 (after trebling) were awarded Mt. Hood, plus attorneys' fees of $1,250,000 and costs. *Id.,* at 83, 104, 106.

On appeal, the United States Court of Appeals for the Ninth Circuit affirmed. 555 F. 2d 687 (1977). We granted certiorari limited to the issue of the correctness of the interpretation of § 5 (i) by the District Court and the Court of Appeals.[12] 434 U. S. 1008 (1978).

---

[11] The four-year period of limitations, as already noted, n. 2, *supra,* is contained in § 4B of the Clayton Act, 15 U. S. C. § 15b (1976 ed.). Tolling of the statute was essential to the award of all damages beyond the normal four-year period, that is, back beyond July 5, 1964, the date four years prior to the date of filing of the antitrust complaint. The sum of $5,194,617, after trebling, is involved in the tolling issue.

[12] Other issues advanced by Greyhound in its petition for certiorari, review of which was not granted, were (a) whether § 5 (12) of the Interstate Commerce Act, 49 U. S. C. § 5 (12), and applicable antitrust principles permitted the treble-damages award by the jury's application of antitrust standards to acquisitions approved by the ICC and to the manner of operation of the acquired companies which is subject to the Commission's "exclusive and plenary" regulatory authority; (b) whether § 5 (a) of the Clayton Act, as amended, 15 U. S. C. § 16 (a) (1976 ed.), permitted the jury to base a finding of violation of the Sherman Act on consent decrees that expressly denied any antitrust violation and were

## II

In holding that the United States' intervention in the ICC proceeding served to toll, by reason of § 5 (i), the Clayton Act's period of limitations, the Court of Appeals stated that "[t]he literal wording of section [5 (i)] is not controlling." 555 F. 2d, at 699. The court, therefore, sought to identify the congressional purpose behind § 5 (i) and to effectuate that purpose. 555 F. 2d, at 699. In the court's view, the purpose of § 5 (i) "is to further effective enforcement of the antitrust laws by permitting private litigants to have the benefits that may flow from governmental antitrust enforcement efforts." 555 F. 2d, at 699. The Court of Appeals, quoting the District Court (App. 80), declared that this purpose would be advanced by " 'treating intervention by Antitrust Division lawyers as the functional equivalent of a direct action by them.' " 555 F. 2d, at 700.

We find this reasoning unpersuasive. In particular, we are unable to agree that the language of § 5 (i) is so unhelpful. Neither do we agree that the congressional purpose behind § 5 (i) is advanced by the holdings of the District Court and the Court of Appeals.

### A

Logic and precedent dictate that " '[t]he starting point in every case involving construction of a statute is the language itself.' " *Santa Fe Industries, Inc.* v. *Green,* 430 U. S. 462, 472 (1977), and *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 197 (1976), each quoting *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring). Examination of the language of § 5 (i) prevents acceptance of respondent's position.

Section 5 (i) begins: "Whenever any civil or criminal proceeding is *instituted by the United States* . . . ." (Emphasis

entered before any testimony was taken; and (c) whether § 4B of the Clayton Act was tolled by fraudulent concealment.

added.) The ICC proceeding at issue here plainly was not one instituted by the United States. As the foregoing statement of facts demonstrates, and as the Court of Appeals acknowledged, "Mt. Hood rather than the United States instituted the proceedings." 555 F. 2d, at 699. It strains accepted usage to argue that a party who intervenes in a proceeding instituted by someone else has also "instituted" that proceeding. This Court has observed:

> "When the term [to intervene] is used in reference to legal proceedings, it covers the right of one to interpose in, or become a party to, *a proceeding already instituted* . . . ." *Rocca* v. *Thompson,* 223 U. S. 317, 330 (1912) (emphasis added).

In truth, the United States not only did not institute the proceeding, but also was not in a position to do so. As its petition to intervene stated, the Government had "no way of knowing" whether Mt. Hood's allegations, which Greyhound denied, were "true or false," and thus it could not in good faith have made the charging allegations necessary to institute the proceeding. At least in this case, therefore, the question is not primarily one of form, that is, who reached the ICC first; it is one of substance, that is, who investigated the facts enabling it to make charging allegations and seek relief and thereby to "institute" the proceeding.

Just as the United States cannot be said to have "instituted" the ICC proceeding, neither had it "complained of," within the meaning of § 5 (i), anything on which the present action is based. The cases in which the applicability of § 5 (i) has been considered establish that the determination of whether a private action is based on matters "complained of" in a prior Government action "[i]n general . . . must be limited to a comparison of the two complaints on their face." *Leh* v. *General Petroleum Corp.,* 382 U. S. 54, 65 (1965); accord, *Luria Steel & Trading Corp.* v. *Ogden Corp.,* 484 F. 2d 1016, 1022 (CA3 1973), cert. denied, 414 U. S. 1158 (1974); *Rader* v.

*Balfour,* 440 F. 2d 469, 473 (CA7), cert. denied *sub nom. Alpha Chi Omega* v. *Rader,* 404 U. S. 983 (1971). In the ICC proceeding here in question, the United States' petition for leave to intervene charged Greyhound with no wrongdoing, took no position on the merits, sought no relief, and, indeed, disclaimed any knowledge of the relevant facts. It sought only an opportunity for Mt. Hood to establish its allegations. This case, therefore, simply cannot be viewed as one based on any matter "complained of" by the United States.[13]

## B

Moreover, the language of § 5 (i) that we rely upon accurately manifests Congress' intent in enacting the section. As the Court previously has noted, the original § 5 of the Clayton

---

[13] The Government's petition to intervene is clearly distinguishable from the Federal Trade Commission's complaint that this Court, in *Minnesota Mining & Mfg. Co.* v. *New Jersey Wood Finishing Co.,* 381 U. S. 311 (1965), held to have tolled the Clayton Act's period of limitations under the predecessor of § 5 (i), 15 U. S. C. § 16 (b) (1964 ed.). There the FTC had filed a proceeding against the subsequent antitrust defendant under § 7 of the Clayton Act, 15 U. S. C. § 18 (1964 ed.). It was clear that the Government had actually charged the defendant with violations of the antitrust laws. The subsequent private antitrust action was directly based on the Government's allegations (which had resulted in a consent order). 381 U. S., at 313, 322–323.

The petition to intervene in question here is also distinguishable from cases (the correctness of which we do not address) holding the Clayton Act's period of limitations to have been tolled by § 5 of the Federal Trade Commission Act, 15 U. S. C. § 45 (1976 ed.). See, *e. g., Luria Steel & Trading Corp.* v. *Ogden Corp.,* 484 F. 2d 1016 (CA3 1973), cert denied, 414 U. S. 1158 (1974); *Rader* v. *Balfour,* 440 F. 2d 469 (CA7), cert. denied *sub nom. Alpha Chi Omega* v. *Rader,* 404 U. S. 983 (1971); *Lippa's, Inc.* v. *Lenox, Inc.,* 305 F. Supp. 182 (Vt. 1969). In each of these cases the Government actually had charged the defendant with, and sought the prevention or punishment of, specific anticompetitive conduct or antitrust violations, and a comparison of the Government's charges with the private litigant's complaint showed that the private action was based on the matter complained of by the Government.

Act, 38 Stat. 731, was adopted in response to the request of President Wilson and consisted of material that now constitutes §§ 5 (a) [14] and 5 (i). [15] In a speech to Congress on January 20, 1914, the President urged that a statute be enacted that would permit victims of antitrust violations to have "redress upon the facts and judgments proved and entered in suits by the Government" and that "the statute of limitations shall be suffered to run against such litigants only from the date of the conclusion of the Government's action. It is not fair that the private litigant should be obliged to set up and establish again the facts which the Government has proved." [16] 51 Cong. Rec. 1964 (1914). This very language of the President was quoted in part in *Minnesota Mining & Mfg. Co.* v. *New Jersey Wood Finishing Co.*, 381 U. S. 311, 318 (1965). Congress acceded to the President's request. What is now

---

[14] 15 U. S. C. § 16 (a) (1976 ed.). This section provides:

"A final judgment or decree heretofore or hereafter rendered in any civil or c[r]iminal proceeding brought by or on behalf of the United States under the antitrust laws to the effect that a defendant has violated said laws shall be prima facie evidence against such defendant in any action or proceeding brought by any other party against such defendant under said laws or by the United States under section 15a of this title, as to all matters respecting which said judgment or decree would be an estoppel as between the parties thereto: *Provided,* That this section shall not apply to consent judgments or decrees entered before any testimony has been taken or to judgments or decrees entered in actions under section 15a of this title."

[15] The original version of what is now § 5 (i) provided:

"Whenever any suit or proceeding in equity or criminal prosecution is instituted by the United States to prevent, restrain or punish violations of any of the antitrust laws, the running of the statute of limitations in respect of each and every private right of action arising under said laws and based in whole or in part on any matter complained of in said suit or proceeding shall be suspended during the pendency thereof." 38 Stat. 731.

[16] President Wilson's message was quoted frequently during the course of the congressional debates to explain the purpose of the amendments. See, *e. g.,* 51 Cong. Rec. 9090, 9488 (1914).

§ 5 (i) was enacted to ensure that private litigants would have the benefit of prior Government antitrust enforcement efforts. 381 U. S., at 317. Here, however, as already has been pointed out, Mt. Hood is seeking to benefit not from a Government antitrust action but from an ICC proceeding that Mt. Hood itself initiated.

Accordingly, construing § 5 (i) as applicable to the facts of this case would not serve Congress' most obvious purpose. It would also fail to give any weight to another related and important congressional purpose. A Ninth Circuit panel very recently emphasized: "Although the plaintiff is correct in asserting that [§ 5 (i)] serves the broad and beneficent purpose of aiding private antitrust litigants . . . it is also true that it is a statute of repose." *Dungan* v. *Morgan Drive-Away, Inc.*, 570 F. 2d 867, 869 (1978). This is clear upon examination of the 1955 amendments to the Clayton Act. 69 Stat. 282. Before these amendments, the period of limitations under the Clayton Act was determined by state law. This bred confusion in the computation of the period within which a private suit was required to be brought, especially when the Act's tolling provision (what is now § 5 (i)) came into play. In order to eliminate this confusion, the amendments established a uniform period of limitations of four years [17] and declared that the suspension of the statute would extend "during the pendency" of the federal proceeding and "for one year thereafter." Finally, the amendments mandated, in what is now the proviso to § 5 (i), that, in the event the statute of limitations is tolled, any private right of action based on the matter complained of in the action by the Government "shall be forever barred unless commenced . . . within four years after the cause of action accrued." [18]

---

[17] 69 Stat. 283, now § 4B of the Clayton Act, as amended, 15 U. S. C. § 15b (1976 ed.).

[18] 69 Stat. 283.

The Senate Report accompanying the 1955 amendments reflects congressional policy against "undue prolongation of [antitrust] proceedings" by extending the limitations period. It noted:

"While the committee believes it important to safeguard the rights of plaintiffs by tolling the statute during the pendency of Government antitrust actions, it recognizes that in many instances the long duration of such proceedings taken in conjunction with a lengthy statute of limitations may tend to prolong stale claims, unduly impair efficient business operations, and overburden the calendars of courts. The committee believes the provision of this bill will tend to shorten the period over which private treble-damage actions will extend by requiring that the plaintiff bring his suit within 4 years after it accrued or within 1 year after the Government's case has been concluded.

"While the committee considers it highly desirable to toll the statute of limitations during a Government antitrust action and to grant plaintiff a reasonable time thereafter in which to bring suit, it does not believe that the undue prolongation of proceedings is conducive to effective and efficient enforcement of the antitrust laws." S. Rep. No. 619, 84th Cong., 1st Sess., 6 (1955).[19]

In view of the congressional emphasis on certainty and predictability in the application of § 5 (i), the Court of Appeals' conclusion that the United States' petition to intervene should be treated as the "functional equivalent of a direct action" by the United States, 555 F. 2d, at 700, is unacceptable. A functional-equivalence standard, applied this loosely, resurrects the very confusion and uncertainty concerning the application of the statute of limitations that Congress sought to eliminate in the 1955 amendments. In a case such as this,

---

[19] See also H. R. Rep. No. 422, 84th Cong., 1st Sess., 8–9 (1955).

in which the Government took no position in its initial petition, a functional-equivalence test would require a detailed review of the record in each proceeding to see what position the Government ultimately took and whether its participation was or was not the "functional equivalent of a direct action." The Government, of course, may well change its position. For example, in *Denver & R. G. W. R. Co.* v. *United States,* 387 U. S. 485 (1967), the Government intervened in an ICC proceeding with one position, adopted another in the District Court, and then "completely reversed" itself in this Court. *Id.,* at 490–492. Thus, endorsement of the suggested functional-equivalence test would mean that it might be impossible to determine whether Government proceedings would toll the statute until those proceedings were finally resolved. As the Court of Appeals seems to have acknowledged, such an approach would lead to serious problems. 555 F. 2d, at 699 n. 31. See also *Dungan* v. *Morgan Drive-Away, Inc.,* 570 F. 2d, at 870–871; cf. *Leh* v. *General Petroleum Corp.,* 382 U. S., at 65. To be sure, one way around these problems would be to say that the statute is tolled anytime the United States participates in any regulatory proceeding, regardless of what it contends or does in that proceeding. Even respondent, however, appears to recognize the undesirability of this result, and that such an interpretation has no support in the language or history of the statute.[20]

## III

We conclude, in sum, that the Clayton Act's statute of limitations was not tolled, under § 5 (i), by the filing of the

---

[20] We do not mean to suggest that no rational distinctions concerning the Government's participation in regulatory proceedings can be drawn. It may be appropriate, in a given case, to apply § 5 (i) where the Government's petition to intervene in fact charged a violation of the antitrust laws and demanded relief to prevent, restrain, or enjoin that violation. That, however, is not this case, and we expressly decline to offer any view as to the applicability *vel non* of § 5 (i) in such a context.

Government's petition to intervene in the ICC proceeding. The judgment of the Court of Appeals is therefore vacated, and the case is remanded for further proceedings consistent with this opinion.[21]

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, concurring.

I concur fully in the Court's opinion, but with great reluctance; in my view respondent is entitled to the award of treble damages ordered by the District Court. Given the Court's analysis of the legal issues involved here, the opinion today has no occasion to focus on Greyhound's egregious behavior toward Mt. Hood Stages—aimed at total destruction of a competitor. In the present case the jury found Greyhound not only to be in violation of the Sherman Act, but that it had fraudulently concealed its antitrust violations for more than a decade. Moreover, the Interstate Commerce Commission found that petitioner's actions were "inspired by a desire to stifle competition," in particular an intent to "injure or destroy" respondent. *Mount Hood Stages, Inc.,* 104 M. C. C. 449, 461 (1968). Beyond its unlawful conduct, Greyhound took the added step of willfully disobeying the enforcement order of the United States District Court. In assessing criminal fines of $600,000 against Greyhound, the District Court, in a careful and detailed opinion, observed that Greyhound had "displayed a contemptuous reluctance to even commence compliance" with the court's order. *United States* v. *Greyhound*

---

[21] As already stated, *supra,* at 329, we limited our grant of certiorari to the issue of the applicability of § 5 (i). Respondent nevertheless argues that even if § 5 (i) is not applicable, the Clayton Act's statute of limitations was tolled under equitable principles. Pursuant to the terms of our grant of certiorari, we see no compulsion—indeed, no justification—for our reaching this distinct issue. It will be for the Court of Appeals, on remand, to determine whether respondent may argue this point and, if so, its merits. Similarly, we express no view on what other issues may be raised on remand.

*Corp.*, 370 F. Supp. 881, 884 (ND Ill. 1974). The District Court went on to note:

> "In determining the extent of Greyhound's willful defiance of the order, the court recognizes Greyhound's record of purposeful non-action, protracted resistance, and emasculating interpretations of the order. The court also notes Greyhound's 'paper compliance' program and the reluctance with which Greyhound's top management became actively involved in securing compliance with the order. All of this suggests that Greyhound's failure to comply with certain parts of the order was deliberate." *Ibid.*

These determinations by the District Court were upheld in every respect by the Court of Appeals. *United States* v. *Greyhound Corp.*, 508 F. 2d 529 (CA7 1974).

There is no question that Mount Hood has been injured substantially by Greyhound. Moreover, were it not for the statute of limitations in the Clayton Act, respondent would clearly receive the full measure of treble damages. However, I am bound to agree with the Court's opinion that the explicit language of § 5 (i) of the Clayton Act, as amended, 15 U. S. C. § 16 (i) (1976 ed.), precludes a *statutory* tolling of the statute of limitations. But as the Court carefully stresses, *ante*, at 337 n. 21, we expressly do not reach respondent's claim that the limitations period should be tolled on *equitable* grounds. The Court of Appeals explicitly left this question open, 555 F. 2d 687, 701 n. 34, and the Court's opinion today leaves it free to re-examine the issue on remand.*

---

*The authority of a federal court, sitting as a chancellor, to toll a statute of limitations on equitable grounds is a well-established part of our jurisprudence. See, *e. g., American Pipe & Constr. Co.* v. *Utah,* 414 U. S. 538 (1974); *Burnett* v. *New York Central R. Co.,* 380 U. S. 424 (1965); *Telegraphers* v. *Railway Express Agency,* 321 U. S. 342, 347–349 (1944). With respect to the limitations period of the Clayton Act, equitable tolling is particularly appropriate since the addition of a federal

Since the Court's remand allows for an inquiry into the issue of equitable tolling, the Court of Appeals may apply traditional equitable principles in reaching its decision. See, e. g., 2 J. Pomeroy, Equity Jurisprudence 90–143 (5th ed. 1941).

---

limitations period in the Act was essentially a "procedural" change in the statute. *American Pipe, supra,* at 558 n. 29.