PATTERNMAKERS LEAGUE OF NORTH AMERICA, Bremerton Branch; Peter N. Terzi; Richard Geiger; Raymond Douglas; Leonard Nelson; George Lynn; David Essy; Jack Wilks; Andrew Laurie; Rocky Vant; Wayne Bernhard; Kenneth Jensen; Donald Darling; John Roy; Jerry Novak, Appellants,

v.

Alan CAMPBELL, Chairman, Office of Personnel Management, and Office of Personnel Management, Appellees.

C.A. No. 77-3133.

United States Court of Appeals, Ninth Circuit.

May 27, 1980.

J. Byron Holcomb, Bremerton, Wash., for appellants.

Charles Pinnell, Asst. U. S. Atty., Seattle, Wash., on brief; Robert A. Reutershan, Atty., Dept. of Navy, Washington, D. C., for appellees.

Before GOODWIN and FARRIS, Circuit Judges, and TAYLOR,* District Judge.

GOODWIN, Circuit Judge:

The Bremerton (Washington) Branch, Patternmakers League of North America, appeals from a summary judgment in favor of the government. We affirm.

The patternmakers involved in this litigation work at the Puget Sound Naval Shipyard. Until 1976, the patternmakers were compensated under various "special" wage schedules for federally employed blue-collar workers. The essential difference between Federal Wage Schedule "special rates," such as those paid the patternmakers, and FWS "regular rates" is that the former may be set within a wide range giving agencies flexibility to adjust to market conditions in attracting qualified personnel, and the latter must fall within statutorily-defined percentages. The Office of Personnel Management, formerly the Civil Service Commission,[1] in cooperation with the Federal Prevailing Rate Advisory Committee

---

* The Honorable Fred M. Taylor, Senior United States District Judge for Idaho, sitting by designation.

1. The Civil Service Reform Act of 1978, Pub. L.No. 95–454, 92 Stat. 1121 (codified at 5 U.S.C. § 1101) (1978), substituted "Office of Personnel Management" for "Civil Service Commission."

(FPRAC),[2] administers the program of special wage schedules. 5 U.S.C. §§ 5343(c)(3)(B) and (e)(4).

On December 11, 1975, the Department of Defense requested authority to cancel the special rates of the Puget Sound shipyard patternmakers. The FPRAC approved the cancellation request, and, in April 1976, the CSC converted the patternmakers' compensation to the regular wage schedule. The position of patternmaker was rated WS–14 on a 15 level schedule.

The Department of Defense requested cancellation of the special rates because they had become obsolete and use of regular FWS rates would result in a wage increase for the patternmakers. The patternmakers now claim that any increase in wages resulting from the conversion to regular rates is only temporary and that, in the long run, they would be better compensated under the special wage rates.

The patternmakers contend that the CSC's procedure in converting them from special to general wage schedules is contrary to both the express language and underlying legislative intent of the relevant statutes, 5 U.S.C. §§ 5343–5349. Specifically, they contend that: (1) the lead agency (the Department of Defense) is required to conduct a wage survey before switching its prevailing rate employees (the patternmakers) from a special to a general wage schedule; (2) the patternmakers are entitled to an administrative appeal from the lead agency's decision to convert their wage schedules; and (3) the patternmakers are entitled to compensation under the special wage schedule that cannot be altered or amended without due process.

The patternmakers cite three provisions as supporting their claim that the Department of Defense was required to conduct a wage survey prior to converting from special to regular wage schedules. They rely first on 5 U.S.C. § 5343(b) which provides, in relevant part, that the Civil Service Commission "shall schedule full-scale wage surveys every 2 years and shall schedule interim surveys to be conducted between each 2 consecutive full-scale wage surveys." The purpose of these surveys is to collect data on which wage schedules and rates, including special surveys and rates, may be based.[3]

The patternmakers also cite a regulation implementing § 5343 which states: "When there is more than one type of wage schedule in the wage area, the agency shall make a separate determination for each wage schedule." 5 C.F.R. § 532.505(b) (1979). Finally, the patternmakers rely on statutory language requiring that, as prevailing rate employees, they be included as participants in the wage survey process. 5 U.S.C. § 5343(c)(2).[4] Implicit in this requirement,

2. FRPAC is a committee of five union members, representing federal employee. organizations, five management members, representing federal agencies which employ blue-collar workers, and an independent chairperson. 5 U.S.C. § 5347. In an affidavit filed with the district court, the chief of the CSC's pay policy division stated that the commission had adopted an internal policy of submitting conversion requests to FRPAC staff for review and recommendations before final action. Such consultation is neither statutorily mandated nor required by implementing regulations.

3. 5 U.S.C. §§ 5343(b) and (c)(3)(B) read as follows:

"(b) The Office of Personnel Management shall schedule full-scale wage surveys every 2 years and shall schedule interim surveys to be conducted between each 2 consecutive full-scale wage surveys. The Office may schedule more frequent surveys when conditions so suggest.

"(c) The Office of Personnel Management, by regulation, shall prescribe practices and procedures for conducting wage surveys, analyzing wage survey data, developing and establishing wage schedules and rates, and administering the prevailing rate system. The regulations shall provide—

(3) for requirements for the accomplishment of wage surveys and for the development of wage schedules and rates for prevailing rate employees, including, but not limited to—

(B) nonsupervisory and supervisory prevailing rate employees paid under special wage schedules and rates; . . . .."

4. 5 U.S.C. § 5343(c)(2) reads as follows:
"The regulations shall provide—

the patternmakers assert, is a condition that special rate employees be consulted before any conversion to regular rates.

■ We begin by looking to the plain meaning of the provisions on which the patternmakers rely. *See Greyhound Corp. v. Mount Hood Stages, Inc.,* 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1977). The language of these provisions indicates that the Civil Service Commission, with the participation of special and general wage employees, is to conduct surveys of wage rates in the appropriate wage areas at least once every two years.[5] However, nothing in the statutory language compels the Civil Service Commission to conduct surveys before it converts special wage schedules to general wage schedules.[6] Nor does the legislative history cited by the patternmakers support reading such a requirement into the statutes. We conclude that Congress did not intend the statutory survey requirements to apply to the conversion of wage schedules.[7]

■ The patternmakers next contend that they are entitled to an administrative appeal of the Civil Service Commission's decision to convert the special wage schedule to the general wage schedule. They base this contention on 5 U.S.C. § 5346(c) which allows employees to appeal the CSC's assignment of positions to occupations and grades.[8]

Under 5 U.S.C. § 5343, the Civil Service Commission may establish a job grading system and assign wage grades to blue-collar jobs in that system.[9] In assigning a wage grade to a particular blue-collar position, the lead agency must consider the level of skill required by the job, the degree of responsibility the work entails, the job's physical demands, and relevant working conditions, as well as the compensation paid for comparable work by other agencies and private employers. *See* Federal Personnel Manual, Chapter 532, subchapter 6–5a(1)(b), at 532–21.

Once a blue-collar job is assigned to a particular wage grade under 5 U.S.C. § 5346(c), aggrieved employees may petition the Commission for a review of their job

---

(2) for participation at all levels by representatives of organizations accorded recognition as the representatives of prevailing rate employees in every phase of providing an equitable system for fixing and adjusting the rates of pay for prevailing rate employees, including the planning of the surveys, the drafting of specifications, the selection of data collectors, the collection and the analysis of the data, and the submission of recommendations to the head of the lead agency for wage schedules and rates and for special wage schedules and rates where appropriate;
. . . ."

**5.** *See* S.Rep. 92–791, 92nd Cong., 2d Sess., *reprinted in* [1972] *U.S.Code Cong. & Admin. News,* pp. 2980, 2983.

**6.** The absence of language mandating the survey the patternmakers seek is in marked contrast to the specificity of the survey requirements for determining the prevailing wage schedule once the Civil Service Commission has determined (with FRPAC approval) which wage schedule is to be used.

**7.** In so holding, we do not consider whether the Civil Service Commission complied with 5 U.S.C. § 5343 by conducting a wage survey in 1976, after the switch from special to general rates. Even assuming that a survey was not

properly conducted, the patternmakers have failed to allege that they were injured by this failure.

**8.** 5 U.S.C. § 5346(c) reads as follows:

"(c) On application, made in accordance with regulations prescribed by the Office, by a prevailing rate employee for the review of the action of an employing agency in placing his position in an occupation and grade for pay purposes, the Office shall—
(1) ascertain currently the facts as to the duties, responsibilities, and qualification requirements of the position;
(2) decide whether the position has been placed in the proper occupation and grade; and
(3) approve, disapprove, or modify, in accordance with its decision, the action of the employing agency in placing the position in an occupation and grade.
The Office shall certify to the agency concerned its action under paragraph (3) of this subsection. The agency shall act in accordance with the certificate, and the certificate is binding on all administrative, certifying, payroll, disbursing, and accounting officials."

**9.** *See* S.Rep., *supra* note 5, *reprinted in* [1972] *U.S.Code Cong. & Admin.News* at p. 2984.

classifications. The Commission is required to investigate and decide such complaints.[10]

The right of appeal conferred by § 5346(c) is triggered when prevailing rate employees are dissatisfied with the wage level assigned to their blue-collar positions. *Cf. Ward v. Campbell*, 610 F.2d 231 (5th Cir. 1980), (review of CSC determination that lead agency had assigned proper wage grade to electrical lineman position). Here, however, the patternmakers do not contend that their work has been assigned the wrong wage grade. They claim, instead, that they are entitled to appeal the cancellation of the special schedule.

Nothing in the language of § 5346 supports the patternmakers' claim. The statute describes review of agency action "placing [a] position in an occupation and grade for pay purposes," not of decisions to convert compensation schedules. Furthermore, the patternmakers cite no legislative commentary implicitly recognizing the right of appeal they seek. Section 5346(c) does not entitle employees to appeal conversion from special to general rates.

The patternmakers claim that an entitlement to compensation under the special schedules is a constitutionally protected property interest which cannot be altered without affording a right of prior hearing or subsequent review.

In evaluating this sort of due proces claim, we have traditionally followed the two step inquiry defined in *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). First, is the interest asserted of the sort that is protected by the Fifth Amendment? And second, if the interest is protected, what sort of process is constitutionally due? *See, e. g., Moore v. Johnson*, 582 F.2d 1228 (9th Cir. 1978); *Hai-*

*mowitz v. University of Nevada*, 579 F.2d 526, 527 (9th Cir. 1978).

 The patternmakers have no property interest in the continuation of special rate compensation. The nature of the interest in the rate schedule is determined by the statutes conferring the benefit and by the regulations and provisions under which it is administered. *See Perry v. Sindermann*, 408 U.S. 593, 599–603, 92 S.Ct. 2694, 2698–2700, 33 L.Ed.2d 570 (1972). Here, nothing in the statutes creates an entitlement in the patternmakers to have wages remain at a fixed level. Wages can go down as well as up as conditions change. And nothing in the Defense Department's administration of the special rates would have justified a reasonable expectation by the patternmakers that special rates could not be revoked following CSC's consultation with FRPAC.

Because the CSC's actions in converting the patternmakers' compensation from special to general schedules did not deprive the patternmakers of a property interest, there was no denial of due process. *See Arnett v. Kennedy*, 416 U.S. 134, 153, 154, 94 S.Ct. 1633, 1643, 1644, 40 L.Ed.2d 15 (1974).

Affirmed.

---

**10.** *Id.* Under the present statutory scheme, employees aggrieved by an adverse agency action appeal to the Merits System Protection Board rather than to the Civil Service Commission. *See* 5 U.S.C. §§ 7513, 7701 and 5 C.F.R. §§ 1200, *et seq.* (1979).