631 F.2d 1324
 1980-2 Trade Cases 63,514
 SOUND, INC., Appellee,
v.
AMERICAN TELEPHONE AND TELEGRAPH COMPANY, Bell Telephone
Laboratories, Inc., Western Electric Company, Inc.
and Northwestern Bell Telephone Company,
Appellants.
 No. 80-1047.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 15, 1980.
Decided Aug. 25, 1980.
 
 Appeal from the United States District Court for the Southern District of Iowa. Hon. Donald E. O'Brien, U.S.D.C., Judge.
 
 
 1
 Harvey Kurzweil, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for appellants; Joseph Angland and Robert W. Hirth, New York City, and Nyemaster, Goode, McLaughlin, Emery & O'Brien, Des Moines, Iowa, on brief.
 
 
 2
 Donald Polden, Hawkins & Norris, Des Moines, Iowa, for appellee; Lex Hawkins and Glenn L. Norris, Des Moines, Iowa, on brief.
 
 
 3
 Ron M. Landsman, Atty., Appellate Section, Antitrust Div., Dept. of Justice, Washington, D. C., for amicus curiae U. S.; Sanford M. Litvack, Asst. Atty. Gen., Robert B. Nicholson, Attys., Dept. of Justice, Washington, D. C., on brief.
 
 
 4
 Before HEANEY and ARNOLD, Circuit Judges, and VIETOR,* District Judge.
 
 
 5
 HEANEY, Circuit Judge.
 
 
 6
 This case presents the difficult problem of reconciling the pro-competitive policies of the antitrust laws with federal and state regulation protecting the public interest in the context of the terminal telephone equipment market.
 
 
 7
 Sound, Inc., an Iowa corporation, brought this antitrust action against the Bell System (Bell), American Telephone and Telegraph Company and its subsidiaries, Bell Telephone Laboratories, Western Electric Company and Northwestern Bell Telephone Company, alleging violations of sections 1, 2 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 2, 3, and of Iowa tort law. Bell moved for judgment on the pleadings, contending that the conduct alleged in the complaint was immune by virtue of regulation by the Federal Communications Commission (FCC) and the Iowa State Commerce Commission (ISCC). The district court[1] denied the motion, holding that the conduct alleged was subject to antitrust scrutiny. The district court certified its decision for interlocutory appellate review and we granted Bell permission to appeal pursuant to 28 U.S.C. § 1292(b).
 
 
 8
 The complaint alleges the following facts.[2] Sound, Inc., began to sell and lease key telephone terminal equipment in Cedar Rapids, Des Moines and Waterloo, Iowa, in 1970. This equipment consists of telephone sets containing six to thirty buttons which allow the telephone user access to several incoming and outgoing lines. Beginning in 1971, Bell engaged in a concerted effort to destroy Sound's business and to exclude Sound from the terminal telephone equipment market in violation of the Sherman Act by predatorily pricing its own equipment, making false and slanderous statements to Sound's customers and potential customers, making threats of economic retribution to Sound's customers, and threatening to withhold telephone service from those purchasing or leasing Sound's equipment.
 
 
 9
 In June, 1971, Bell filed a tariff with the ISCC that substantially reduced the rates for all the equipment that was in competition with Sound's equipment. The ISCC suspended the rates and later rejected them because Bell had not provided sufficient cost justification. During the suspension and even after the rejection of these rates, Bell's sales personnel represented to Sound's customers that the lower rates would quickly be approved and that the customers should not do business with Sound. In 1973, Bell filed another tariff proposing lower rates for the competing equipment. Again, the rates were suspended and again, Northwestern Bell's sales personnel represented to Sound's customers that the lower rates were assured and that the customers should not purchase Sound's equipment. In January, 1975, the ISCC approved the tariff filed in 1973.
 
 
 10
 In late 1974, Bell filed tariffs involving a new series of terminal key equipment offerings known as ComKey. The tariffs established a "two-tier" price system. Rates denominated "Vintage I" automatically went into effect upon filing, and they were substantially modified and increased by tariffs denominated "Vintage II" in 1975. Sound alleged that these tariffs were filed by Bell with knowledge that they were grossly noncompensatory.
 
 
 11
 The complaint also alleged that Sound was damaged by Bell's requirement that Protective Connecting Arrangements (PCA's) be attached to any telephone terminal equipment owned or leased by anyone other than Bell. Sound alleged that Bell required the PCA's knowing they were unnecessary, poorly designed, harmful to Sound's equipment, unnecessarily and anticompetitively expensive and improperly installed and maintained. Bell required these PCA's by tariffs filed with the FCC until 1975.[3]
 
 
 12
 The complaint further alleged that Bell deprived Sound of free and unlimited access to the FCC and state regulatory agencies and that Bell interfered with Sound's business relations in violation of state tort law.
 
 
 13
 In its answer, Bell claimed that its rate-related conduct is exempt from antitrust scrutiny by the state action doctrine. It also alleged that all activity undertaken by Bell regarding the interconnection of privately owned terminal telephone equipment is impliedly immune because the antitrust and regulatory standards are inconsistent and because the conduct is pervasively regulated. Bell further alleged that its marketing practices are exempt and immune because they are an integral part of the regulated conduct.
 
 
 14
 We affirm the district court's denial of Bell's motion for judgment on the pleadings.
 
 
 15
 * IMPLIED IMMUNITY
 
 
 16
 This appeal involves no question of express immunity. Bell does not argue that the Communications Act of 1934 contains any explicit grant of statutory immunity from the antitrust laws. Nor has Bell attempted to demonstrate that Congress, in passing the Communications Act, intended to immunize the telecommunications industry generally from the antitrust laws; in fact, the explicit immunization of certain FCC-approved consolidations and mergers of telephone companies, 47 U.S.C. §§ 221(a), 222(c)(1), indicates that Congress did not contemplate a blanket immunity. See Mt. Hood Stages, Inc. v. Greyhound Corp., 555 F.2d 687, 691 (9th Cir. 1977), cert. denied in part, 434 U.S. 1008, 98 S.Ct. 716, 54 L.E.2d 750, rev'd in part, 437 U.S. 322, 98 S.Ct. 2370, 57 L.Ed.2d 239 (1978).
 
 
 17
 The question presented here, one of implied immunity, is whether the tension between the antitrust laws and the scheme of FCC regulation of the interconnect industry impliedly repeals the Sherman Act.[4] The statutory schemes of regulation, the implementation of those schemes and the competitive situations have varied so greatly from industry to industry that no clear path for determining whether implied immunity exists has been illuminated. Some guiding principles have been established, however. Implied repeal of the antitrust laws "is not favored and not casually to be allowed. Only where there is a 'plain repugnancy between the antitrust and regulatory provisions' will repeal be implied." Gordon v. New York Stock Exch., 422 U.S. 659, 682, 95 S.Ct. at 2611 (1975) (quoting United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 350-351, 83 S.Ct. 1715, 1734, 10 L.Ed.2d 915 (1963)). See United States v. National Ass'n of Secs. Dealers, 422 U.S. 694, 719-720, 729-730, 95 S.Ct. 2427, 2442-2443. 2447-2448, 45 L.Ed.2d 486 (1975); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414 U.S. 117, 126, 94 S.Ct. 383, 389, 38 L.Ed.2d 348 (1973). The antitrust laws and the regulatory statutes must be reconciled where feasible, United States v. National Ass'n of Secs. Dealers, supra, 422 U.S. at 720, 95 S.Ct. at 2443; Gordon v. New York Stock Exch., supra, 422 U.S. at 683, 95 S.Ct. at 2611, and " '(r)epeal is to be regarded as implied only if necessary to make (the regulatory statute) work, and even then only to the minimum extent necessary.' " Gordon v. New York Stock Exch., supra, 422 U.S. at 683, 95 S.Ct. at 2612 (quoting Silver v. New York Stock Exch., 373 U.S. 341, 357, 83 S.Ct. 1246, 1257, 10 L.Ed.2d 389 (1963)). The pervasive nature of the regulatory scheme is a factor in determining whether implied repeal exists, Gordon v. New York Stock Exch., supra, 422 U.S. at 688, 95 S.Ct. at 2614; however, certain activities by industries perceived to be heavily regulated have been held subject to the antitrust laws. Silver v. New York Stock Exch., supra (securities); Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (generation and transmission of electric power); United States v. Philadelphia Nat'l Bank, supra (national banking); United States v. RCA, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959) (broadcasting).
 
 
 18
 The Court's application of these principles has resulted in a finding of implied immunity when enforcement of the antitrust laws would interfere with the operation of the regulatory agency.[5] Interference has been found when the antitrust laws would prohibit action specifically contemplated by the regulatory statute, Gordon v. New York Stock Exch., supra; United States v. National Ass'n of Secs. Dealers, supra, or when the antitrust laws would prohibit conduct falling precisely within the detailed statutory scheme of enforcement and that statutory scheme specifically required consideration of competition. Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973); Pan Am. World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963).
 
 
 19
 Bell relies on Gordon v. New York Stock Exch., supra, to sustain its view that the challenged activities are impliedly immune. In Gordon, a group of investors challenged the SEC-sanctioned system of fixed stock commission rates as being violative of the antitrust laws. The Court rejected the challenge. It held that Congress, in enacting the Securities Exchange Act, intended to leave supervision of the fixing of reasonable rates of commission to the SEC and thus impliedly immunized the practice from antitrust challenge. The Court found two factors to be dispositive: (1) the supervisory power was granted seven years after the Court's decision that price fixing is a per se violation of the Sherman Act, United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927); and (2) the Securities Exchange Commission actively supervised and approved the fixing of commission rates over a period of years. The Court concluded that the enforcement of the antitrust laws "would preclude and prevent the operation of the Exchange Act as intended by Congress and as effectuated through SEC regulatory activity." Gordon v. New York Stock Exch., supra, 423 U.S. at 691, 95 S.Ct. at 2615.
 
 
 20
 In United States v. National Ass'n of Secs. Dealers, supra, the Court found that vertical restrictions on secondary market activities designed to maintain prices in brokerage transactions of mutual funds were exactly the type of curbs on competition that Congress thought necessary in enacting the Investment Company Act of 1940, 15 U.S.C. § 80a-1 et seq. The Court found the SEC's regulatory authority so pervasive as to confer an implied immunity on the alleged horizontal conspiracy to prevent a secondary market in mutual fund shares, particularly in view of the SEC's consistent approval of the agreements to which the subject matter of the antitrust action was ancillary.
 
 
 21
 Two other cases upon which Bell relies, Hughes Tool Co. v. Trans World Airlines, Inc., supra, and Pan Am. World Airways v. United States, supra, involved even more explicit statutory schemes of regulation. In Hughes Tool, TWA brought an antitrust suit challenging Toolco's exercise of its control over TWA's acquisition and financing of aircraft. Toolco had developed its control over TWA through stock acquisitions specifically investigated and approved by the Civil Aeronautics Board; further, each acquisition of aircraft by the airline had been approved by the CAB. Because the CAB had exercised its authority to approve Toolco's acquisition of TWA's stock pursuant to section 408 of the Federal Aviation Act of 1958, 49 U.S.C. § 1378, and because that section required an appraisal of the impact of the proposed action on monopoly and competition, the Court held Toolco's actions impliedly immune from the antitrust laws. In Pan Am, the Court similarly held immune the anticompetitive interference by Pan Am with acquisition of a route by Panagra, a joint venture of Pan Am and Grace Company. The Court relied on the statutory grant in section 411 of the Federal Aviation Act, 49 U.S.C. § 1381, authorizing the CAB to investigate and regulate unfair methods of competition among air carriers. Both Hughes Tool and Pan Am emphasize section 414 of that Act, 49 U.S.C. § 1384, which explicitly immunizes from the antitrust laws any action taken pursuant to a CAB order.
 
 
 22
 Our approach, then, is to consider both the statute under which the industry is regulated and the exercise of regulatory authority over the challenged activity pursuant to the statute.
 
 
 23
 Prior to passage of the Federal Communications Act of 1934, 47 U.S.C. § 151 et seq., the telecommunications industry was subject both to the jurisdiction of the Interstate Commerce Commission and the antitrust laws.[6] The Communications Act provides that the carriers generate tariffs showing all charges and all classifications, practices and regulations affecting such charges, and file those tariffs with the FCC, 47 U.S.C. § 203(a); that the FCC and the public be given thirty days notice of any proposed change in a tariff, id. § 203(b); and that no charge be demanded or collected, refunded or remitted except in accordance with a filed tariff. Id. § 203(c). The FCC is empowered, either upon a complaint or on its own initiative, to conduct a hearing concerning the lawfulness of a tariff, and has been authorized to suspend the tariff for up to three months pending completion of the hearing. Id. § 204 (subsequently amended to five months). The FCC is also authorized "to determine and prescribe what will be the just and reasonable charge * * * to be thereafter observed, and what classification, regulation, or practice is or will be just, fair, and reasonable, to be thereafter followed * * *." Id. § 205(a) The FCC's guiding standard is the public interest. Id. § 201. The Communications Act also provides a saving clause:
 
 
 24
 Nothing in this Act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this Act are in addition to such remedies.
 
 
 25
 Id. § 414.
 
 
 26
 Nothing in the language of the Communications Act or its history convinces us that Congress, in establishing a system of regulation of the telecommunications industry, sought to displace the antitrust laws. Accord, Essential Communications Sys., Inc. v. American Tel. & Tel. Co., 610 F.2d 1114 (3d Cir. 1979); MCI Communications Corp. v. American Tel. & Tel. Co., 462 F.Supp. 1072 (N.D.Ill.), mandamus denied, 594 F.2d 594 (7th Cir. 1978), cert. denied, 440 U.S. 971, 99 S.Ct. 1533, 59 L.Ed.2d 787 (1979); United States v. American Tel. & Tel. Co., 461 F.Supp. 1314 (D.D.C.1978). Since no goals are set forth in the statute that are clearly repugnant to the antitrust laws, we must examine the FCC's exercise of its authority over the interconnect industry to determine "whether allowance of an antitrust suit would conflict with the operation of the regulatory scheme * * *." Gordon v. New York Stock Exch., supra, 422 U.S. at 688, 95 S.Ct. at 2614.
 
 
 27
 Bell has provided terminal equipment to customers since its inception and effectively cornered the market on such equipment by filing tariffs with the FCC that prohibited the attachment to the Bell System of any equipment not furnished by Bell. This broad prohibition was held violative of the Communications Act by the Fifth Circuit in 1956. Hush-A-Phone Corp. v. United States, 238 F.2d 266 (D.C. Cir. 1956). The Hush-A-Phone was simply a cup-shaped device that snapped on a telephone receiver to afford privacy to the speaker. Bell construed the decision narrowly and filed new tariffs prohibiting all direct electrical connection with the telephone system. In 1968, the FCC ruled this tariff illegal and encouraged Bell to adopt technical standards that would weed out harmful devices while allowing the interconnection of safe equipment. Use of the Carterfone Device, 13 F.C.C.2d 420, 423-424, reconsideration denied, 14 F.C.C.2d 571 (1968). Bell then filed tariffs permitting interconnection of customer-supplied equipment but requiring the use of Bell-supplied "protective connecting arrangements."[7] The FCC undertook an investigation of the tariff, expressly stating that its decision not to immediately grant relief to those challenging the tariff should not be interpreted as tacit approval. AT&T "Foreign Attachment" Tariff Revisions, 15 F.C.C.2d 605, 610 (1968), reconsideration denied, 18 F.C.C.2d 871 (1969). The FCC contracted with the National Academy of Science for a study of interconnection, and the Academy concluded that Bell's protective connecting arrangements were not necessary and were potentially harmful to competitor's equipment.
 
 
 28
 In 1975, the FCC invalidated the tariff and established its own technical standards for interconnection. Equipment meeting those standards was to be registered with the FCC, and Bell could not require PCA's for that equipment. Proposal for New or Revised Classes of Interstate and Foreign MTS and WATS, First Report and Order, 56 F.C.C.2d 593 (1975), on reconsideration, 57 F.C.C.2d 1216, 58 F.C.C.2d 716, 59 F.C.C.2d 83 (1976); Second Report and Order, 58 F.C.C.2d 736 (1976), on reconsideration, 61 F.C.C.2d 396, 64 F.C.C.2d 1058 (1977), aff'd sub nom. North Carolina Utils. Comm'n v. FCC, 552 F.2d 1036 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). That registration program is still in effect.
 
 
 29
 Bell contends that the "public interest" standard enunciated by the Communications Act and applied by the FCC conflicts with the pro-competition standard of the antitrust laws. We do not agree. The record does not show that the FCC has exercised its supervisory authority over the industry in an effort to prevent the development of competition in the terminal equipment market; rather, its rulings have indicated that Bell's attempts to retain its monopoly in that market are disfavored. Although the FCC's attempts to interject competition into this market may have been sluggish, they have been real and have not reflected an approval of Bell's interconnect-related conduct. In light of this, the maintenance of an antitrust suit will not conflict with the operation of the regulatory scheme authorized by Congress but will supplement that scheme. See Gordon v. New York Stock Exch., supra, 422 U.S. at 690, 95 S.Ct. at 2615.
 
 
 30
 Bell, not the FCC, proposes its rates, regulations and restrictions, subject, of course, to FCC approval. In filing each tariff, Bell implements its own business judgment in regard to its relationship with competitors. "When these relationships are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws." Otter Tail Power Co. v. United States, supra, 410 U.S. at 374, 93 S.Ct. at 1028. We see nothing in the public interest standard that would prevent Bell from making business judgments that conform to the requirements of antitrust law, and nothing unfair in requiring it to do so.
 
 
 31
 Bell's argument also rests on the pervasiveness of the Communication Act's regulatory scheme. The extent of the regulatory framework's control of an industry is a factor to be considered in determining whether certain conduct is impliedly immune from the antitrust laws, see United States v. National Ass'n of Secs. Dealers, supra, 422 U.S. at 732-733, 95 S.Ct. at 2448-2449; Hughes Tool Co. v. Trans World Airlines, Inc., supra; Pan Am. World Airways v. United States, supra, but we do not view the FCC's control over the interconnect industry to be so pervasive as to warrant a finding of immunity, particularly in the absence of a showing that the two statutes conflict. See Mid-Texas Communications Sys., Inc. v. American Tel. & Tel. Co., 615 F.2d 1372 (5th Cir. 1980); MCI Communications Corp. v. American Tel. & Tel. Co., supra.
 
 
 32
 We find support for our interpretation of the Communications Act in the views of the FCC. Unlike the SEC in the stock exchange cases, the FCC has strongly urged that its jurisdiction should not displace the antitrust law, writing: "The Commission has never considered its authority over equipment interconnection to displace the antitrust laws." Memorandum of FCC as Amicus Curiae (in United States v. American Tel. & Tel. Co., 461 F.Supp. 1314 (D. D.C. 1978)), 62 F.C.C.2d 1102, 1114 (1975).
 
 
 33
 While we recognize that there has been some division in the cases considering the question of implied immunity for Bell's interconnection-related activities, we think the better-reasoned solution lies in holding that Bell is not impliedly immune but is liable for the antitrust violations that may be proven. See Mid-Texas Communications Sys., Inc. v. American Tel. & Tel. Co., supra; Essential Communications Sys., Inc. v. American Tel. & Tel. Co., supra; Litton Sys., Inc. v. American Tel. & Tel. Co., 487 F.Supp. 942 (S.D.N.Y.1980); MCI Communications Corp. v. American Tel. & Tel. Co., supra; United States v. American Tel. & Tel. Co., 461 F.Supp. 1314 (D. D.C. 1978); Jarvis, Inc. v. American Tel. & Tel. Co., 481 F.Supp. 120 (D. D.C. 1978); United States v. American Tel. & Tel. Co., 427 F.Supp. 57 (D. D.C. 1976). Contra, Monitor Business Machines, Inc. v. American Tel. & Tel. Co., 1978-1 Trade Cas. (CCH) P 62,030 (C.D. Cal. 1978); Phonetele, Inc. v. American Tel. & Tel. Co., 435 F.Supp. 207 (C.D. Cal. 1977), appeal pending; DASA Corp. v. General Tel. Co., 1977-2 Trade Cas. (CCH) P 61,610 (C.D. Cal. 1977), appeal pending.
 
 II
 STATE ACTION EXEMPTION
 
 34
 Bell contends that its rate structure and marketing practices relating to the terminal equipment market are exempt, as state action, from antitrust challenge because Iowa regulates the rates Bell charges for the installation and monthly use of Bell's equipment. Bell relies on the Parker doctrine[8] and its recent articulation in California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). On the basis of this record, we reject Bell's argument.
 
 
 35
 As a public utility, Bell is required to file tariffs with the Iowa State Commerce Commission setting forth its proposed rates. Iowa Code § 476.6. "(A)ny person or body politic" may request the Commission to determine the reasonableness of "rates, charges, schedules, service, regulations, or anything done or omitted to be done by any public utility * * *." Id. § 476.3. Upon such complaint or the Commission's own motion, the public utility is required to satisfy the Commission of the reasonableness of the challenged action. The Commission may institute a formal proceeding and conduct hearings. If it finds the utility's action to be "unjust, unreasonable, discriminatory or otherwise in violation of any provision of law," it may determine and enforce reasonable rates or regulations. Id.
 
 
 36
 The tariffs prepared by Bell have been the subject of formal hearings and extensive investigation by the ISCC over the past several years. The ISCC has rejected some rates and charges as anticompetitive. See Reasonableness of Certain Rates and Charges for Business Phone Service Provided by Northwestern Bell Telephone Company Under TF1-115 and TF1-161, Iowa State Commerce Commission Docket No. U-366, Order at 2 (Dec. 23, 1971) (rejecting proposed rates); Northwestern Bell Telephone Company, Iowa State Commerce Commission Docket No. U-514, Decision and Order (Dec. 21, 1976) (approving certain rates with modification but rejecting equipment lease termination charge as an illegal penalty).
 
 
 37
 The ISCC has recognized that it should apply antitrust considerations in its decisionmaking, saying,
 
 
 38
 (O)ur inquiry must also be based upon "an awareness * * * of the opportunities for competition in the markets supplied by public utilities, and the growing insistence of remedial action by the courts and regulatory agencies so that access to those opportunities may be realized as the law permits."
 
 
 39
 Northwestern Bell Telephone Company, Iowa State Commerce Commission Docket No. U-467, Decision and Order at 2 (Jan. 28, 1975). The ISCC has denied certain rates proposed by Bell for multiline telephone equipment because the evidence showed a "distinct anticompetitive effect." Docket No. U-366, supra at 2. The ISCC has also noted that its functions include "establishing a first line of defense against those competitive practices that might later be the subject of antitrust proceedings." Docket No. U-467, supra at 3 (quoting Gulf States Utils. Co. v. FPC, 411 U.S. 747, 758 (1973)). The ISCC stated that it had "fully accommodated" the policies of state and federal antitrust laws in Docket No. U-514, supra at 7.
 
 
 40
 With this overview of the Iowa regulatory scheme in mind, we turn to an analysis of the state action exemption cases relevant to this factual situation. In Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the plaintiff sought to enjoin the enforcement of an agricultural prorate program administered pursuant to state legislation intended to stabilize the market price of various commodities, including raisins. The Court held that Congress did not intend the Sherman Act to apply to state action, saying:
 
 
 41
 We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.
 
 
 42
 Parker v. Brown, supra, 317 U.S. at 350-351, 63 S.Ct. at 313.
 
 
 43
 For thirty years, the Supreme Court offered little guidance in the application of Parker. In 1975, the Court decided Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), holding that the minimum fee schedule for title examination promulgated by the county bar, a voluntary association, and enforced by the state bar, an administrative agency, was not immune from Sherman Act attack. The fee schedule was not required by any state statute or by any rules of the state supreme court. In fact, the state supreme court's rules directed lawyers not to be controlled by fee schedules. The Court's "threshold inquiry" was whether the activity was "required by the State acting as sovereign," id., 421 U.S. at 790, 95 S.Ct. at 2015, and the Court held that it was not.
 
 
 44
 The next year, in Cantor v. Detroit Edison Co., 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), a sharply divided Court held that a public utility's program of providing free light bulbs to customers was not immune from the Sherman Act in spite of the state's approval of tariffs filed by Detroit Edison establishing the program. Mr. Justice Stevens, writing for the Court, identified the issue as "whether the Parker rationale immunizes private action which has been approved by a state and which must be continued while the state approval remains effective." Id. at 581, 96 S.Ct. at 3113. In those portions of the opinion in which five members concurred, the Court held that the commission's approval and the fact that the practice could not be discontinued without approval did not render the conduct immune. The state's policy was "neutral on the question whether a utility should, or should not, have (a light bulb) program." Id. at 585, 96 S.Ct. at 3115. No specific statute referred to regulation of the light bulb business, and other state utilities did not have such a program. The Court noted that the decision to provide free light bulbs was one in which both the commission and Detroit Edison participated, but that the option to have or not have the program was "primarily" Detroit Edison's. Id. at 593-594, 96 S.Ct. at 3118-3119. Further, Detroit Edison, not the state, had initiated the program. The Court applied a fairness analysis and determined that, under the circumstances, there was "nothing unjust" in requiring the utility to make business choices that conformed to federal law.
 
 
 45
 The Cantor Court further noted that it was not logically inconsistent to require a utility to "meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy." Id. at 596, 96 S.Ct. at 3120 (footnote omitted). The Court found that Michigan's regulatory scheme did not conflict with antitrust policy and concluded that no exemption from the antitrust laws existed.
 
 
 46
 In Bates v. State Bar, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Court addressed the question of whether Arizona's prohibition of attorney advertising was exempt from Sherman Act challenge under Parker v. Brown, supra. The Court held that the disciplinary rule, the affirmative command of the state supreme court, was exempt. The Court distinguished Cantor on three grounds.
 
 
 47
 First, and most obviously, Cantor would have been an entirely different case if the claim had been directed against a public official or public agency, rather than against a private party. Here, the appellants' claims are against the State.
 
 
 48
 Second, the Court emphasized in Cantor that the State had no independent regulatory interest in the market for light bulbs. There was no suggestion that the bulb program was justified by flaws in the competitive market or was a response to health or safety concerns. And an exemption for the program was not essential to the State's regulation of electric utilities. In contrast, the regulation of the activities of the bar is at the core of the State's power to protect the public. * *
 
 
 49
 Finally, the light-bulb program in Cantor was instigated by the utility with only the acquiescence of the state regulatory commission. The State's incorporation of the program into the tariff reflected its conclusion that the utility was authorized to employ the practice if it so desired. The situation now before us is entirely different. The disciplinary rules reflect a clear articulation of the State's policy with regard to professional behavior.
 
 
 50
 Id., 433 U.S. at 361-362, 97 S.Ct. at 2697 (citations and footnotes omitted).
 
 
 51
 In Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Court held that a municipal utility operator was not excluded from the antitrust laws. The plurality opinion expressed the view that Parker v. Brown, supra, exempted only acts of government by the state as sovereign or by a municipality pursuant to the state's policy of replacing competition with either regulation or monopoly public service. The plurality emphasized the need for a clearly articulated state policy of displacing competition with regulation[9] and active supervision by the policymaker. Significantly, it distinguished Cantor's analysis because it presented the question whether "anticompetitive activity in which purely private parties engaged" could be insulated from antitrust attack. Id. at 410 n. 40, 98 S.Ct. at 1136 n. 40.
 
 
 52
 We turn, finally, to Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), which Bell contends is controlling. Midcal involved a challenge to California's statutorily created wine-pricing program, which constituted resale price maintenance in violation of the Sherman Act. California charged Midcal, a wine wholesaler, with violating state law by selling wine below the effective price schedule of E. & J. Gallo Winery. Midcal filed a writ of mandate seeking to enjoin the state's program. A state court of appeals granted the mandate and enjoined the program. The California Retail Liquor Dealers Association, as intervenor, sought certiorari in the United States Supreme Court. The question presented involved the exemption of state conduct from the antitrust laws an exemption that does not necessarily coincide with that for a private defendant.
 
 
 53
 The Court briefly reviewed the leading cases, including those we have discussed, and articulated two standards for applying a state action exemption from the antitrust laws: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." Id., 445 U.S. at 105, 100 S.Ct. at 943, 63 L.Ed.2d at 243.
 
 
 54
 The Court held that the California system satisfied the first standard because the legislative policy was "forthrightly stated and clear in its purpose to permit resale price maintenance(,)" id., which would otherwise be a per se violation of the Sherman Act. It held that the second standard was not satisfied, however, because the state simply authorized the prices set by private parties and enforced them without reviewing their reasonableness, saying, "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price fixing arrangement." Id.
 
 
 55
 As the above decisions demonstrate, the determination of whether state regulation of private action is "state action" and therefore exempt from the antitrust laws is not an easy task. "Like many other phantasmagoria of the law, we know it is there, but it is hard to define precisely what it is, and, unlike obscenity, we do not always know it even when we see it." Kennedy, Of Lawyers, Lightbulbs, and Raisins: An Analysis of the State Action Doctrine Under the Antitrust Laws, 74 Nw.L.Rev. 31 (1979). We are convinced, however, that the following factors are relevant to our determination: the existence and nature of any relevant statutorily expressed policy; the nature of the regulatory agency's interpretation and application of its enabling statute, including the accommodation of competition by the regulator; the fairness of subjecting a regulated private defendant to the mandates of antitrust law; and the nature and extent of the state's interest in the specific subject matter of the challenged activity.
 
 
 56
 Nothing in the Iowa statutes establishing the Iowa State Commerce Commission or its system of regulating public utilities even remotely suggests an intention to require anticompetitive conduct on the part of a public utility. Nothing in the statutes resembles the direct establishment of a program of resale price maintenance as in Midcal or the proscription of advertising as in Bates, nor is there any other explicit requirement of action prohibited by the Sherman Act. On the contrary, the statute prohibits rates "in violation of any provision of law," which presumably includes the Sherman Act. By requiring just and reasonable rates and charges, the statute provides a means of preventing the abuse of monopoly power by public utilities; it does not purport to aid an industry by giving it a competitive advantage as did the State of California in Parker v. Brown, supra. We thus are unable to find in the state statutes any clearly articulated or affirmatively expressed policy of replacing competition with regulation in the telephone terminal equipment market.
 
 
 57
 Nothing in the ISCC's interpretation and application of the statute indicates a requirement of anticompetitive conduct or displacement of competition. See discussion on pages 1332, supra. Rather, the ISCC has indicated an accommodation of federal antitrust law and the advancement of competition, its underlying goal, in the market for telephone terminal equipment. This accommodation certainly cannot be construed as an intent to displace competition in that market.
 
 
 58
 Nothing in this record suggests it is unfair to subject Bell to the standards of the antitrust laws. Bell, not the ISCC, proposed the rates at issue. Bell sought diligently to have those rates accepted by the ISCC, unsuccessfully opposing the intervention of Midwestern Telephone Company, Sound's successor, in one rate investigation proceeding. Docket No. U-514, supra at 4. The ISCC's approval of some of those proposed rates reflected the conclusion that "the utility was authorized to employ the (rate) if it so desired(,)" Bates v. State Bar, supra, 433 U.S. at 362, 97 S.Ct. at 2698, not a conclusion that the rates were mandated. Bell was not deprived of its power to exercise its independent business judgment in determining the rates it would propose. The state's involvement is not "so dominant that it would be unfair to hold a private party responsible for his conduct in implementing it(.)" Cantor v. Detroit Edison, Co., supra, 428 U.S. at 594-595, 96 S.Ct. at 3119. The Court's conclusion in Cantor is equally appropriate here: "There is nothing unjust in a conclusion that respondent's participation in the decision is sufficiently significant to require that its conduct implementing the decision, like comparable conduct by unregulated businesses, conform to applicable federal law." Id. at 594, 96 S.Ct. at 3119 (footnote omitted).
 
 
 59
 Finally, nothing in the record indicates that the State of Iowa's interest in the terminal telephone equipment market is such as to displace the antitrust laws. The issue before us would be different if the purpose of Iowa's exercise of its regulatory control was to avoid the consequences of unrestrained competition, subject only to the strictures of the antitrust laws, in the telephone terminal equipment market. The record before us, however, clearly does not present such a case. Again, the Court's conclusion in Cantor is particularly appropriate:
 
 
 60
 On the contrary, public utility regulation typically assumes that the private firm is a natural monopoly and that public controls are necessary to protect the consumer from exploitation. There is no logical inconsistency between requiring such a firm to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy.
 
 
 61
 Id. at 595-596, 96 S.Ct. at 3120 (footnotes omitted).
 
 
 62
 Thus, Iowa's regulation of Bell's rates poses no necessary conflict with the federal requirement that respondent's activities in competitive markets satisfy the standards of the antitrust laws.
 
 
 63
 In summary, we disagree with Bell's contention that the standards of Midcal have been satisfied. The state's authorization of a public utility's proposed rates in a competitive market does not constitute a "clearly articulated and affirmatively expressed state policy," and does not exempt the utility from the Sherman Act.[10]
 
 
 64
 The judgment of the district court is affirmed.
 
 
 
 *
 The Honorable HAROLD D. VIETOR, United States District Judge for the Southern District of Iowa
 
 
 [1]
 The United States District Court for the Southern District of Iowa, Judge Donald E. O'Brien presiding
 
 
 [2]
 Because the case is before this Court on the district court's refusal to dismiss under Fed.R.Civ.P. 12(c), the facts well-pleaded by the plaintiff are deemed true. Quality Mercury, Inc. v. Ford Motor Co., 542 F.2d 466, 468 (8th Cir. 1976) cert. denied, 433 U.S. 914, 97 S.Ct. 2986, 53 L.Ed.2d 1100 (1977)
 
 
 [3]
 See page 1330, infra. Sound ceased doing business in 1975 because its liabilities exceeded its assets
 
 
 [4]
 Although the FCC has jurisdiction over Bell's activities in the interconnect area, North Carolina Utils. Comm'n v. FCC, 552 F.2d 1036 (4th Cir.), cert. denied, 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977), that is not sufficient to imply immunity. "The Court has never held * * * that the antitrust laws are inapplicable to anticompetitive conduct simply because a federal agency has jurisdiction over the activities of one or more of the defendants." Gordon v. New York Stock Exch., 422 U.S. 659, 692, 95 S.Ct. 2598, 2616, 45 L.Ed.2d 463 (1975) (Stewart, J., concurring), quoted in Cantor v. Detroit Edison Co., 428 U.S. 579, 596 n. 36, 96 S.Ct. 3110, 3120 n. 36, 49 L.Ed.2d 1141 (1976)
 
 
 [5]
 For a recent Eighth Circuit case discussing this issue, see National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City, Blue Cross Association, 628 F.2d 1050 (8th Cir. 1980)
 
 
 [6]
 See the detailed discussion of the Act's history in Essential Communications Sys., Inc. v. American Tel. & Tel. Co., 610 F.2d 1114, 1117-1120 (3d Cir. 1979)
 
 
 [7]
 Bell claims that it required protective connecting arrangements because it did not know how otherwise to adequately protect the integrity of its equipment. The claim is a factual matter to be established at trial. The claim is relevant, if at all, only to the merits of the antitrust charges rather than to the claim of immunity
 
 
 [8]
 The word "exemption" is "a shorthand expression for Parker's holding that the Sherman Act was not intended by Congress to prohibit the anticompetitive restraints imposed by California in that case." Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 393 n. 8, 98 S.Ct. 123, 1126 n. 8, 55 L.Ed.2d 364 (1978)
 
 
 [9]
 The Court reiterated this requirement in New Motor Vehicle Bd. v. Orrin W. Fox Co., 439 U.S. 96, 109, 99 S.Ct. 403, 411-412, 58 L.Ed.2d 361 (1978). In that case, the Court held exempt from Sherman Act challenge a California statute requiring that new automobile dealerships within the market area of an existing franchisee must be approved by the New Motor Vehicle Board
 
 
 [10]
 Having disposed of these contentions, we necessarily reject Bell's claim that its marketing practices are immune because they are "integrally related" to the regulated conduct. Bell also contends that the district court erred in failing to dismiss the portion of Sound's complaint that alleged a denial of access to federal and state regulatory agencies. We find this contention to be without merit. See California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972)