Wendell POWELL, by and through Sylvia Powell, his mother and next friend, and Wanda Williams, by and through Gloria Williams, her mother and next friend, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Richard S. SCHWEIKER, as Secretary of the Department of Health and Human Services of the United States, Defendant.

No. 80–465–Civ–J–B.

United States District Court, M. D. Florida, Jacksonville Division.

May 14, 1981.

Amy E. Hirsch, Anne Swerlick, Jacksonville Area Legal Aid, Inc., Jacksonville, Fla., for plaintiffs.

Alan M. Grochal, Ralph W. Gaines, Chief of Litigation, Social Security Div., Dept. of Health and Human Services, Baltimore, Md., Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for defendant.

## OPINION AND ORDER

### SUSAN H. BLACK, District Judge.

This cause is before the Court on defendant's Motion for Summary Judgment, filed herein on August 28, 1980, and on plaintiff's Motion for Class Certification, filed herein on August 18, 1980, and for Summary Judgment, filed herein on December 23, 1980. The Court heard oral argument on January 27, 1981.

Plaintiff filed this suit as a class action on behalf of all minor children denied Supplemental Security Income (SSI) disability benefits pursuant to regulations promulgated by defendant. He seeks declaratory and injunctive relief invalidating the regulations as inconsistent with both the regulatory scheme and the enabling statute, and asks the Court to remand his case to defendant for further consideration. Because the Court finds that the regulation in question is not inconsistent with either the regulatory scheme or the underlying statute, and because defendant's denial of disability benefits is supported by substantial evidence, the Court does not reach the class action question in affirming defendant's decision and granting his Motion for Summary Judgment.

## I. The Facts

This Court has jurisdiction to review a final administrative decision by the Secretary of Health and Human Services pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g) (1976). The decision must be upheld if supported by substantial evidence. "Substantial evidence" is such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

Plaintiff Wendell Powell was born November 23, 1962. Through his mother he applied for and was granted SSI disability benefits for mental retardation effective December 30, 1976. The examining physician at the time rated his full-scale IQ as 53, noting that he exhibited no other obvious physical or emotional problems and would probably be capable of performing "simple routine repetitive work" on completion of whatever education he sought. Tr. 114–16.

Subsequent reexamination in April, 1979, indicated that plaintiff had improved his full-scale IQ score to 72. The examining physician classified him in the range of mild to borderline retardation. Plaintiff was found capable of following one and two step instructions and performing "routine and repetitive tasks with reliability." Affect, demeanor and self-care ability were found to be good. Again, no emotional or psychiatric disabilities aside from retardation were noted. Tr. 119–20.

Based on these findings, defendant informed plaintiff that his disability benefits were to be terminated after June, 1979, since his mental impairment was no longer considered severe. (*See infra*, Part V). Plaintiff sought review of this decision, and a hearing was held before an administrative law judge (ALJ) on October 31, 1979. The

ALJ heard the testimony of plaintiff, his mother and the Director of the Clay County Association for the Retarded. On November 29, 1979, after reviewing the medical evidence, he upheld the termination decision. The Appeals Council declined to disturb the ALJ's determination, and thereafter it became defendant's final decision.

The ALJ's ruling was based on plaintiff's failure to exhibit an impairment as severe as, or medically the equivalent of, any of the impairments listed in Appendix 1, Subpart I, following 20 C.F.R. § 416.985 (1978).[1] Prior to April, 1979, plaintiff had met the standard listed in § 112.05(B), Part B, Appendix 1, which specifies mental retardation of IQ 59 or less as presumptively disabling. He now challenges the Secretary's failure to use a third basis for finding disability— the "all pertinent facts" test, or consideration of all circumstances in the case—apart from the listed impairments or their medical equivalent.[2]

## II. The Statute and Regulations

The Secretary's rule-making power extends to the promulgation of rules and regulations "not inconsistent with the provisions of this title." 42 U.S.C. §§ 405(a) and 1383(d)(1). The statutory standard of disability is contained in 42 U.S.C. § 1382c(a)(3)(A) and (B):

(3)(A) An individual shall be considered to be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months *(or, in the case of a child under the age of 18, if he suffers from any medically determinable physical or mental impairment of comparable severity).*

(B) For purposes of subparagraph (A), an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country. (emphasis added).

Pursuant to this mandate, defendant promulgated regulations by which disability determinations might be made on a more-or-less routine basis. The basic definition of disability closely follows the statute's:

§ 416.901 Disability and blindness; general.

(b) *Disability defined.* An individual is disabled for purposes of this part if:

---

1. The April 1, 1979, revision of Title 20, Parts 400–499 of C.F.R. inadvertently omitted Part B of the Appendix, and thus the 1978 revision must be referred to in order to locate the special listings used for children. *See* 44 Fed.Reg. 47,766 (1979). Unless otherwise specified, all references are to the April 1, 1979 revision of 20 C.F.R.

2. Plaintiff Wanda Williams was added as a party-plaintiff on January 20, 1981, following the Government's lack of objection to a motion to intervene. Plaintiff Williams, unlike plaintiff Powell, never received SSI disability benefits. She was denied benefits, however, allegedly based "solely on findings that [her] impairments did not meet any of the listings" in the regulations nor their medical equivalents, Pl.

Mem. in Support of Motion to Intervene, Dec. 10, 1980. She has submitted no statement of facts or details of administrative proceedings leading to denial of her claim. The Court therefore reads her complaint as challenging only the legal sufficiency of the listed impairment/medical equivalent method of evaluating child disability. This reading is confirmed by plaintiff's aim to "strengthen and improve class representation," Pl.Mem. Dec. 10, 1980, by her intervention in this action. Because the Court finds that the regulations as promulgated are valid and does not reach the class action issue, the Court declines to remand plaintiff Williams's claim to the Secretary for further consideration.

(1) He is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months (or, in the case of a child under the age of 18, if he suffers from any medically determinable physical or mental impairment of comparable severity);

. . . .

(c) *Physical or mental impairment defined.* A physical or mental impairment is an impairment which results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. Statements of the applicant, including his own description of his impairment (symptoms) are, alone, insufficient to establish the presence of a physical or mental impairment.

20 C.F.R. § 416.901(b)(1) and (c).

For adults age 18 or older, § 416.902 provides that "all the pertinent facts" of the case shall be used to determine whether an impairment constitutes a disability. Medical considerations alone can justify a finding of disability, or they may be supplemented by such vocational factors as an individual's "residual functional capacity" and age, education and work experience. § 416.902(a), (b). If an individual's impairment(s) meets or equals one of those listed in Part A of Appendix 1 to Subpart I, however, no further factors need be considered for a disability finding to be made. § 416.904(a)(2). In any event, any medically determinable impairments may justify a finding of disability if the impairments are severe and prevent an individual from engaging in substantial gainful activity. § 416.904(b).

Children's disabilities are judged under a different and, according to plaintiff, more restrictive scheme. Section 416.915, the regulation in question in this lawsuit, provides:

§ 416.915 Evaluation of disability of a child under age 18.

A child under age 18 will be found to be disabled as defined in § 416.901(b)(1) if he has a medically determinable physical or mental impairment of comparable severity to that which qualifies an individual age 18 or over. Disability shall be deemed to be of comparable severity and to exist under § 416.901(b)(1) if the child is not engaging in substantial gainful activity, and if:

(a) His impairment or impairments meet the durational requirements in § 416.901(b)(1), and are listed in Appendix 1 to this Subpart I; or

(b) His impairment or impairments are not listed in Appendix 1 to this Subpart I but singly or in combination meet the durational requirements in § 416.901(b)(1) and are determined by the Social Security Administration, with appropriate consideration of the particular effect of disease processes in childhood, to be medically the equivalent of a listed impairment (see § 416.905).[3]

Section 416.916 provides that an individual's impairment(s) shall be considered medically the equivalent of a listed impairment "only if the medical findings with respect thereto are at least equivalent in severity and duration," as shown by medical evidence "demonstrated by medically acceptable clinical and laboratory diagnostic techniques, including a medical judgment furnished by one or more physicians designated by the Social Security Administration, relative to the question of medical equivalence." § 416.916(b). The "all pertinent facts" test is not part of the procedure. Rather, following the statutory mandate that children shall be found disabled if their impairments are "of comparable severity" to that which would disable an adult, 42 U.S.C. § 1382c(a)(3)(A), the Secretary *deemed* a child's disabilities to be of comparable severity if they meet or equal a listed impairment, "with appropriate consideration of

---

**3.** In 1978, this section was codified as § 416.-904. The parenthetical reference in (b) to

§ 416.905 is carried over from the 1978 version. The reference should be to § 416.916.

the particular effect of disease processes in childhood." § 416.915(b). This failure to carry over the adult evaluation scheme into the area of children's disabilities, says plaintiff, makes § 416.915 fatally inconsistent with both § 416.901 and the statutory definition of disability.

### III. Interpretative Context

"[T]he starting point in every case involving construction of a statute is the language itself." *Greyhound Corp. v. Mt. Hood Stages*, 437 U.S. 322, 330, 98 S.Ct. 2370, 2375, 57 L.Ed.2d 239 (1978). Where, as here, the language of the statute (in particular, the phrase "of comparable severity") is the subject of conflicting interpretations, it is appropriate for the Court to look to the legislative history for guidance. *Train v. Colorado Public Interest Research Group*, 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976).

Unfortunately, the legislative history of the Supplemental Security Income program gives sparse attention to the subject of childhood disability benefits. In considering comprehensive amendments to the Social Security Act in 1971, the House Ways and Means Committee expressed strong support for inclusion of disabled children in the new SSI program.

> It is your committee's belief that disabled children who live in low-income households are certainly among the most disadvantaged of all Americans and that they are deserving of special assistance in order to help them become self-supporting members of our society. Making it possible for disabled children to get benefits under this program, if it is to their advantage, rather than under the programs for families with children, would be appropriate because their needs are often greater than those of nondisabled children. The bill, accordingly, would include disabled children under the new program. Parents' income and resources would be taken into account in determining the eligibility and benefits of children under age 21.

H.R.Rep. No. 92–231, 92d Cong., 1st Sess. 147–148, *reprinted in* [1972] U.S.Code Cong. & Ad.News 4989, 5133–4.

In its substantive discussion, however, the House Report simply restates the statutory definition:

> A person would be considered disabled if he were unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or has lasted, or is expected to last, for not less than 12 months. A child under age 18 who is not engaging in substantial gainful activity would be considered disabled under the bill if he suffers from any medically determinable physical or mental impairment of comparable severity. An individual (other than a child under age 18) would be found disabled if his impairments are so severe that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

*Id.* at 5134.

On its face, the House Report reiterates the cross-reference in the statute from "substantial gainful activity" to "comparable severity." The last sentence excludes vocational factors for children, however. Adults are disabled if they cannot work because of their impairments. Children are disabled if their impairments are "of comparable severity," but they are presumed not to work: the work-related criterion of the last sentence relates only to individuals "other than a child under age 18."

The Senate Finance Committee Report on the SSI program suggests a policy rationale behind differing treatment for children and adults beyond the fact that children are presumed not to work. Noting that the "House-passed bill would extend Federal benefits to permanently and totally disabled children under age 18" and that "benefits would be substantially higher than benefits for these children if they received family welfare benefits," the Senate Report goes on to say,

The House justified its inclusion of disabled children under age 18 under aid to the disabled, if it is to their advantage, rather than under the program for families with children, on the grounds that their needs are often greater than those of nondisabled children. The needs of disabled children, however, are generally greater only in the area of health care expenses. In all but the two States that do not have medicaid programs, children now eligible for cash assistance are covered under existing State medicaid assistance programs. Disabled children's needs for food, clothing, and shelter are usually no greater than the needs of nondisabled children.

The passage concludes: "Under the committee bill, the new income security program would apply only to disabled persons 18 years of age and older." S.Rep. No. 92–1230, 92d Cong., 2d Sess. 385 (1972).

Children were finally included in the Conference Committee version of SSI, which was enacted into law. By amendment without comment to the Senate-passed bill, the "comparable severity" language was inserted into the basic disability definition. See H.R.Rep. No. 92–1605, 92d Cong., 2d Sess. 27 (1972). Congressional floor debate had been virtually devoid of any reference to inclusion of disabled children in the SSI program. Representative Mills uttered the sole pertinent remark which the Court could find among several hundred pages of recorded commentary: "Severely disabled children under age 18 would be eligible for help" in the Conference Committee bill. 118 Cong.Rec. 36917 (October 17, 1972). More important to the House and Senate conferees was making the determination of disability a matter of federal law:

> Under present law each State is free to prescribe its own definition of blindness and disability for purposes of eligibility for aid to the blind and aid to the permanently and totally disabled.

> Under the new supplemental security income program, there would be a uniform Federal definition of "disability" and "blindness."

> The term "disability" would be defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." This definition is the same as that now used in the Social Security disability insurance program.

*Id.* at 36923.

Some clarification of children's status under SSI appears in the legislative history of the 1976 Unemployment Compensation Amendments, Pub.L. 94–566 § 501 (Oct. 20, 1976), 90 Stat. 2667. There, use of the listed impairments test for determining childhood disabilities is assumed. The Senate Finance Committee Report on the Amendments complains that "development of guidelines for applying this [statutory] definition to children has proved to be an extraordinarily slow and difficult process for the Social Security Administration."

> The regulations which have been issued with regard to disability for children state that if a child's impairments are not those listed, eligibility may still be met if the impairments "singly or in combination . . . are determined by the Social Security Administration, with appropriate consideration of the particular effect of the disease processes in childhood, to be medically the equivalent of a listed impairment."

This is the language of 20 C.F.R. § 416.-915(b). Again, the Senate Committee's difficulties with that language went not to the fact that it distinguished inequitably between children and adults, but rather that it left State administration of SSI in disarray. "SSA has been circulating draft regulations with criteria for child disability for some time. The fact that they have not yet been issued, however, has meant that the States have been forced to adopt their own guidelines, which may well vary greatly from jurisdiction to jurisdiction." Aiming for some "assurance that children with similar conditions are treated similarly throughout the Nation," the Amendments

required the Social Security Administration to publish criteria for childhood disability determinations within 120 days for use by State agencies. "This action should end the present uncertainty which the State agencies and others have with regard to what constitutes disability in a child and enable disabled children to benefit from the program on an equitable basis." S.Rep. No. 94–1265, 94th Cong., 2d Sess. 24–25, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5997, 6018–19.

What few pertinent remarks appear in the floor debate confirm the Finance Committee's reading of the bill. Said Senator Bentsen:

> Section 501 of today's bill requires H.E.W. to implement provisions of the SSI law that have essentially gone unnoticed since the law went into effect in January, 1974. These provisions relate to the development of a definition of disability as it applies to children and the provision of rehabilitative services that are specifically geared to children. *The current situation is that the only definition of disability applied for purposes of SSI eligibility relates to employability . . . a concept obviously irrelevant to children. Thus, different jurisdictions treat children with the same disability in different ways.* Moreover, these children are referred to the State vocational rehabilitation agency which often does not offer services helpful to children.
>
> Section 501 requires H.E.W. to issue a definition of disability as it relates to children . . . .

122 Cong.Rec. 33301 (September 29, 1976) (emphasis added).

Said Senator Bayh:

> Of particular concern is the current status of children in this [SSI] program. It has been 4 years since the Congress enacted the SSI program, and there are still no adequate guidelines which would enable State agencies to determine how to apply the program to children. Individual States, receiving no direction from the Federal Government, have been adopting their own widely varying guidelines.

> Therefore, the legislation before us today would require the Social Security Administration within 120 days of enactment to publish criteria to be used by State agencies in making child disability regulations [sic].

*Id.* at 33302.

Responding to Congressional concern, the Secretary devised criteria for determining childhood disabilities with the special needs of children in mind. A separate listing of impairments, designated as Part B of Appendix 1 following 20 C.F.R. § 416.985, was set apart for use only in determining children's disabilities "where the criteria in Part A do not give appropriate consideration to the particular effect of disease processes in childhood." 42 Fed.Reg. 14,705 (1977). *See* 20 C.F.R. § 416.917(b). The Secretary had constructed the list of children's impairments over a two-year period in consultation with his own medical consulting staff, other practicing physicians and health care professionals (especially psychologists) specializing in pediatrics.

Following publication of the new Part B "children's list," the Secretary received public comment for 45 days. Discussion of the comments fills nearly three pages in the Federal Register.

The Secretary's remarks on the new regulations show clearly that their drafters carefully considered the statutory language of 42 U.S.C. § 1382c(a)(3)(A) in formulating the special list of children's impairments.

> In determining "comparable severity," it is necessary to recognize that the manifestations of certain disease processes in children may be different than in adults, even where the diagnosed disease is the same.
>
> . . . .
>
> Those impairments which were determined to impact on the child's development to the same extent that the adult criteria have on an adult's ability to engage in substantial gainful activity were deemed to be of "comparable severity" to the adult listing.

42 Fed.Reg. 14,705 (1977). Moreover, the Secretary anticipated much of the present

controversy in discussing use of work-related criteria for evaluating childhood maladies.

Section 416.904 [recodified in 1979 as § 416.915] states that a child under age 18 will be found to be disabled as defined in § 416.901(b)(1) if he has a medically determinable physical or mental impairment of comparable severity to that which qualifies an individual age 18 or over. Several writers expressed concern about the phrase "if the child is not engaging in substantial gainful activity" as contained in § 416.904 [sic]. A recommended substitution for "substantial gainful activity" was "age-appropriate major daily activities." ... *[W]e believe that to set a standard based on "age-appropriate major daily activities" for all impairments is unduly restrictive and not within the intent of the law.*

*Id.* at 14,706. (emphasis added).

### IV. Judicial Review of § 416.915

a. Has the Secretary misinterpreted his own regulations?

██ Plaintiff apparently has no quarrel with the particular impairments listed separately for children's disabilities. The attack, rather, is on any scheme by which a single set of criteria, or their medical equivalents, forms the sole basis for a finding of disability. The Secretary could expand the list of children's impairments indefinitely, in other words, but would not be in compliance with the statutory mandate of "comparable severity."

The Court cannot agree. Plaintiff attempts to draw an analogy to provision for widows' disability benefits under the Social Security Act, 42 U.S.C. § 423(d)(2)(B), where a listed impairment test is allowed. *See Sullivan v. Weinberger,* 493 F.2d 855 (5th Cir. 1974), *cert. denied,* 421 U.S. 967, 95 S.Ct. 1958, 44 L.Ed.2d 455 (1975). He recognizes that the difference in statutory language between that provision and provision in § 423(d)(1)(A) for general disability benefits under the Act (inability to do "any gainful activity" in the case of widows, "substantial gainful activity" for other

wage earners) leads to a stricter standard of disability for widows. Because courts have recognized that restricting widows to listed impairments follows a clear legislative design to impose a harsher disability test on them, *see Sullivan v. Weinberger,* 493 F.2d at 862, he concludes that restricting children to a list is likewise more restrictive than the adult standard and clearly contravenes the mandate of comparable severity in § 1382c(a)(3)(A) and, by reference, 20 C.F.R. § 416.901(b)(1).

The phrase "of comparable severity" was an unhappy choice by the draftsmen of § 1382c(a)(3)(A), since it fails to describe the real effect of disabling diseases on children. The legislative history of the Unemployment Compensation Amendments of 1976 reveals the uncertainty caused by attempts to apply the definition literally. (See p. 445, *supra*). As the Secretary recognized, the same disease process may affect children differently than adults. Recognizing that difference can lead logically to different evaluative schemes for adult and childhood disabilities, since nominally "comparable" afflictions may in fact require differing thresholds of severity before child victims are properly considered disabled. These thresholds may be higher or lower than for adults, as the case may be. No easy generalization about "comparable severity" is possible, especially when non-medical factors enter the evaluation process only because of the work-related foundation to the concept of adult disability. (See *infra*).

This is not to say that a listed impairment scheme is the only or even the best possible method for evaluating disabled children, simply that it does not make the regulations internally inconsistent. For the Court to substitute its own judgment about what constitutes "comparable severity" would be to overturn a policy which the Secretary's expertise particularly qualifies him to develop. Widows are bound by a list only advisory for other adults, *see Martin v. Secretary of H. E. W.,* 492 F.2d 905, 910 (4th Cir. 1974), while children are considered under the separate Part B listings,

unavailable to any adults whatsoever. If children are denied the "all pertinent facts" basis for judging disability, that is, they are nonetheless entitled to consideration under the exclusive Part B criteria. Promulgation of the separate listings, which are continually revised in light of medical developments, *see* 42 Fed.Reg. 14,707 (1977), accords separate and special consideration to children and fulfills the Secretary's obligation to give "appropriate consideration [to] the particular effects of disease processes in childhood." 20 C.F.R. § 416.915(b). By promulgating separate regulations exclusively for use in evaluating childhood disabilities, the Secretary has acted consistently with the "comparable severity" language of 20 C.F.R. § 416.901(b)(1). Plaintiff has failed to meet the heavy burden upon him to show that the Secretary has misinterpreted his own regulations. Absent a showing that the Secretary's version is plainly erroneous, his interpretation controls. *Udall v. Tallman,* 380 U.S. 1, 18, 85 S.Ct. 792, 802, 13 L.Ed.2d 616 (1964).

b. Has the Secretary misinterpreted the statute?

■ Likewise, the Secretary's interpretation of the statute is not clearly erroneous or unreasonable. The thrust of plaintiff's attack goes to the Secretary's failure to use an "all pertinent facts" test to measure children's disabilities. Since the Secretary's use of such a test to evaluate adults includes vocational criteria, plaintiff argues that the Secretary should develop a flexible procedure using "those factors for children which are comparable to vocational factors for adults," including adaptive behavior, functional limitations and personal development, all of which are "widely recognized as evaluative of a child's ability to function in the world and [which] can be measured through well established techniques." Pl. Mem. Dec. 23, 1980 at 7.

■ Unfortunately, more is at stake than a child's "ability to function in the world." Adults are so evaluated because their functional capacity relates directly to their capacity to work and produce income. The statute speaks of inability to engage in "substantial *gainful* activity" as the test of adult disability. Had Congress meant a child's version of that test to imply "ability to function in the world," it could have simply said, "in the case of children, substantial activity." The test would then resemble the "age-appropriate daily activities" standard considered and rejected by the Secretary. *See* 42 Fed.Reg. 14,706 (1977). But the test is one of gainful activity. Loss of self-support is the *sine qua non* of adult disability.

■ The definition of disability in 42 U.S.C. § 1382c(a)(3)(A) is identical to that found in the Social Security Act, 42 U.S.C. § 423(d). *Strickland v. Harris,* 615 F.2d 1103, 1105–6 (5th Cir. 1980). Says one commentator about § 423(d),

> The medical disability requirement obviously expresses some special solicitude for the sick. But this concern may only reflect the feeling that those who are "sick" have suffered an involuntary decline in working capacity. From this perspective, the medical disability requirement becomes an attempt to draw a line between voluntary and involuntary unemployment. We are prepared to support an individual whose workforce participation terminates after even minimal achievements, but only on the theory—which the prior work requirement itself reflects— that disability benefits replace income which the worker expected to receive from his job, and are not an alternative to work. Thus the medical disability requirement enforces an iron logic: those who can work must work.

Liebman, *The Definition of Disability in Social Security and Supplemental Security Income: Drawing the Bounds of Social Welfare Estates,* 89 Harv.L.Rev. 833, 843 (1976). Although Professor Liebman criticizes use of the Social Security Act's disability definition in SSI as "psittacistic"—"SSI can take Social Security's words but not its meaning, because the SSI test will generally be applied to persons who have never worked," *id.* at 860—this Court *must* take the statute at its apparent meaning, absent

some evidence suggesting that another reading is required to effect the legislative purpose. *Malat v. Riddell*, 383 U.S. 569, 571, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966).

■ The apparent meaning of the statutory definition of disability is work-related. The word "work" appears no less than seven times in 42 U.S.C. § 1382c(a)(3)(B), which amplifies subparagraph (A), the basic disability provision. It is settled law that an adult claimant must prove inability to work before he will be found entitled to disability benefits. *See e. g., Fruge v. Harris*, 631 F.2d 1244, 1246 (5th Cir. 1980). Admittedly, adult disability is judged in light of "all the pertinent facts," but that test is itself suggested by statutory language focussed on the fact of working: an individual will be found disabled if his impairments are so severe "that he is not only unable to do his previous work but cannot, *considering his age, education, and work experience*, engage in any other kind of substantial gainful work . . . ." 42 U.S.C. § 1382c(a)(3)(B). (emphasis added). Thus, while the Secretary must consider subjective complaints like pain in assessing disability, the totality of impairments must still prevent an individual from working. *DePaepe v. Richardson*, 464 F.2d 92, 99–100 (5th Cir. 1972); *Gaultney v. Weinberger*, 505 F.2d 943, 945–6 (5th Cir. 1974); *Rhynes v. Califano*, 586 F.2d 388, 390 (5th Cir. 1978), *reh. en banc denied*, 589 F.2d 1114 (5th Cir. 1979); *Strickland v. Harris*, 615 F.2d at 1106. Not every subjective ill meets this test. *Cf. Laffoon v. Califano*, 558 F.2d 253, 256 n.7 (5th Cir. 1977) ("We agree with the Administrative Law Judge that 'cultural deprivation' is not a medical impairment contemplated by the Social Security Act.") It should also be noted that children were specifically excluded from the "all pertinent facts" portion of the disability definition, even by the legislative report most insistent on child participation in SSI. *See* [1972] U.S.Code Cong. & Ad.News 5134; *supra*, 7–8.

In summary, a child is presumed not to be employed. He is presumed to be dependent on his parents for support; thus his parents' income and resources are considered in determining eligibility for SSI. 42 U.S.C. § 1382c(f)(2). Yet his impairment is measured as "comparably severe" to that which prevents an adult from working. Ultimately, the Secretary must determine if vocational criteria are to be disregarded, giving consideration only to the medical aspects of childhood disability, or if vocational criteria are to be modified and their functional equivalents used for children.

■ The Court need not decide whether Senator Bentsen was correct in remarking that a definition of disability couched in terms of employability is "obviously irrelevant" to children. *See* 122 Cong.Rec. 33301 (September 29, 1976). From all that appears, Congress did not directly consider the question when it added the "comparable severity" language of § 1382c(a)(3)(A). Later legislative attention focused on uniform treatment among children, not uniformity between children and adults. However, the Secretary and not the Court is charged by Congress with responsibility for prescribing regulations to show that an alleged impairment constitutes a disability. *Sullivan v. Weinberger*, 493 F.2d at 859–60. Although the Secretary's interpretation of the statute is not conclusive, it is a substantial factor to be considered in construing the statute, *see Youakim v. Miller*, 425 U.S. 231, 235, 96 S.Ct. 1399, 1402, 47 L.Ed.2d 701 (1976), especially when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." *Udall v. Tallman*, 380 U.S. at 16, 85 S.Ct. at 801. To sustain the Secretary, the Court need not find his construction of the statute to be the only reasonable one, "or even that it is the result that we would have reached had the question arisen in the first instance in judicial proceedings." *Id.; Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978). *See*

*B. B. v. Schweiker*, 643 F.2d 1069 (5th Cir. 1981); *Seagraves v. Harris*, 629 F.2d 385, 390–91 (5th Cir. 1980). In that light, the Secretary's reading of the statute and promulgation of regulations pursuant thereto is neither erroneous nor unreasonable, solely because children's disabilities are treated differently, though not clearly more "restrictively," than adults'.

### V. Substantial Evidence

Having found that 20 C.F.R. § 416.915 is a valid exercise of the legislative authority delegated to the Secretary under § 1382c, it remains only to determine whether the Secretary's decision denying SSI disability benefits is supported by substantial evidence.

A summary of the administrative record, as presented by the Government and adopted by plaintiff, Pl.Mem. Dec. 23, 1980 at 4, is set out verbatim as an appendix to this Opinion. The Court's independent review of the record confirms that plaintiff introduces no evidence to controvert the finding that his full-scale IQ was 72 as of April, 1979. His case rests on a challenge to the listed impairments/medical equivalent test as the sole means of finding disability.

The Court having found that § 416.915 is a valid regulation under the statute, the burden is upon the plaintiff to produce substantial evidence showing his entitlement to benefits through affliction with a listed impairment or its medical equivalent. *Western v. Harris*, 633 F.2d 1204, 1206 (5th Cir. 1981); *Winfield v. Mathews*, 571 F.2d 164, 167–9 (3rd Cir.), *cert. denied, sub nom. Winfield v. Califano*, 439 U.S. 869, 99 S.Ct. 198, 58 L.Ed.2d 180 (1978).

The burden of establishing disability under the Social Security Act is so heavy that it has been described as bordering on the unrealistic. *Johnson v. Harris*, 612 F.2d 993, 997 (5th Cir. 1980). On the other hand, if the administrative findings are supported by substantial evidence, they are conclusive, and a reviewing court may not reweigh the evidence or substitute its judgment for that of the administrative fact-finder, even if the reviewing court views the evidence as preponderating otherwise. *Wilkinson v.*

*Schweiker*, 640 F.2d 743, 744 (5th Cir. 1981); *Strickland v. Harris*, 615 F.2d at 1106.

The regulations provide that a child shall be considered disabled if his IQ measures 59 or less, 20 C.F.R. § 112.05(B), Appendix 1, Subpart I; if his IQ measures 60–69 inclusive "and a physical or other mental impairment impos[es] additional and significant restriction of function or developmental progression," § 112.05(C); or if he achieves "only those developmental milestones generally acquired by children no more than one-half the child's chronological age," § 112.05(A). The examining physician found, and plaintiff does not contradict, that plaintiff fails to meet any of the above standards. Uncontradicted medical evidence is admittedly not binding on the administrative law judge making a disability determination. Although the ALJ may not arbitrarily ignore evidence pointing solely to a finding of disability, *Goodley v. Harris*, 608 F.2d 234, 236 (5th Cir. 1979), where plaintiff introduces no medical evidence to the contrary, he has not met his burden of showing that the decision of the ALJ was unsupported by substantial evidence. *Cf. Fields v. Harris*, 498 F.Supp. 478, 488 (N.D.Ga.1980).

It is upon consideration

ORDERED:

1. That plaintiff's Motion for Class Certification, filed herein on August 18, 1980, is denied.

2. That plaintiff's Motion for Summary Judgment, filed herein on December 23, 1980, is denied.

3. That the Government's Motion for Summary Judgment, filed herein on August 28, 1980, is granted. The decision of the Secretary, denying SSI disability benefits to plaintiff, is affirmed. The Clerk shall enter summary judgment for defendant.

### APPENDIX

#### Statement of Facts

At the administrative hearing held on October 31, 1979, plaintiff testified that he

attends Green Cove Springs Elementary School and takes courses in reading, mathematics, and money and banking (Tr. 42). He is capable of doing counting and subtraction (Tr. 44). He dresses himself and helps his mother at home (Tr. 49–50), sweeping the floor and taking the garbage out (Tr. 51). Plaintiff also testified that he plays sports, watches television (Tr. 54–55) and goes to church (Tr. 56).

Plaintiff's mother stated that he has difficulty judging time and is often late for school (Tr. 63). She noted that he takes a bus to school and waits at the bus stop alone (Tr. 60). She testified that after school, some of his friends often come over to play football (Tr. 64).

Ms. Nancy Keating, the Director of the Clay County Association for the retarded, also testified (Tr. 70). She stated that she has known plaintiff for approximately six years and that he participates in summer programs. She corroborated his mother's testimony to the effect that he has difficulty judging time (Tr. 71). She stated that plaintiff performed many activities but needed constant supervision. Over the six years that she has known him, Ms. Keating commented that he has matured to some extent (Tr. 72). Ms. Keating felt that plaintiff would be able to work in a sheltered environment (Tr. 73) although he would be unable to engage in competitive gainful activity (Tr. 75).

The medical evidence of record includes a short statement by Dr. John M. Malone, a general practitioner (Tr. 123). Dr. Malone's records indicated that plaintiff was in the moderate range of retardation although no record of his IQ was available. The physician reported that he had no disabilities other than the mild retardation (Tr. 114).

Dr. Thomas R. Long, a clinical psychologist, has also submitted a medical report of plaintiff's condition (Tr. 115–117). Dr. Long described him as physically normal and friendly. He reported that plaintiff comprehends instructions, follows directions well, and gives the appearance of being more intellectually capable than his test scores indicate. Plaintiff's speed of performance in all areas was termed "slow," but there was no evidence of organicity or psychomotor difficulties. Dr. Long felt that by the time plaintiff completes whatever educational level he decides to complete, that he will be capable of performing simple routine repetitive work. He would be easy to get along with on the job and Dr. Long noted that he possesses no reluctance to perform simple chores around the immediate household (Tr. 116). Classification was mild mental retardation. Plaintiff's verbal IQ was 55, performance IQ 60 and his full scale IQ was 53.

Dr. Malone reported on April 6, 1979, that plaintiff had had a mild urinary tract infection but that it had been treated and controlled (Tr. 118).

Dr. Harry Krop, a clinical psychologist, saw plaintiff on April 5, 1979 (Tr. 119–122). Dr. Krop related that he has attended special education classes for the past few years. He was described as amiable and oriented. Plaintiff's mother indicated that he is able to dress himself and has good personal hygiene. She added that he is cooperative and helps around the house. He plays basketball, shoots marbles, and likes to play guitar. Test results revealed a verbal IQ of 80, performance IQ of 66, and a full scale IQ of 72 (Tr. 120). Dr. Krop stated that these scores placed plaintiff in the low borderline range of intellectual functioning. His short term memory and ability to recall digits were described as unusually good. However, his general fund of information, word knowledge, and academic skills were significantly depressed. His psychomotor and perceptual skills were in the range of mild mental retardation. The psychologist felt that he was capable of following one and two step instructions provided they were concrete, specified, and demonstrated. Despite the fluctuations, Dr. Krop concluded that plaintiff's overall functioning was within the range of mental retardation. He added that plaintiff could be expected to perform routine and repetitive tasks without constant supervision. On a supplemental questionnaire, Dr. Krop reported that plaintiff had moderate restric-

tion of activities, moderate constriction of interests, moderate restriction on his ability to relate to others, and no deterioration in personal habits (Tr. 122).

Also included in the administrative transcript were copies of plaintiff's school records covering the period between November 20, 1978, and February 2, 1979 (Tr. 124–145). Darlene A. Gantt, a helping teacher, submitted three reports on plaintiff's placement in Green Cove Springs Middle School (Tr. 124–128). He was initially given a trial placement period between November 27 and December 15, 1978, in the Educable Mentally Handicapped (EMH) program (Tr. 124). This was later extended through January 25, 1979 (Tr. 126). Plaintiff's strengths were listed as politeness and ability to get along with other students. His weaknesses were lack of peer interaction, limited attention span, perseverance, memory, and punctuality. On January 25, 1979, Ms. Gantt reported that several Green Cove Springs Middle School officials met with plaintiff's mother and grandmother to discuss his situation (Tr. 128). The unanimous feeling of the group was that he would be most helped in the Trainable Mentally handicapped (TMH) secondary program.

Christy T. Gimer, plaintiff's language teacher during his trial period in the EMH program, reported that his reading ability was not progressing satisfactorily although he was able to read to some extent (Tr. 129–136). Ms. Gimer concluded that plaintiff was reading on the level of the average elementary EMH child (Tr. 132). His spelling did not improve (Tr. 133) and his handwriting was done at a slow rate. Plaintiff rarely participated in games with other children. He was often late for class (Tr. 135). Ms. Gimer concluded that plaintiff would benefit more from the TMH program where skills for everyday living are stressed than the EMH program which is a more structured academic-oriented program (Tr. 136).

Cheryl Wood, his math teacher, also filed a report on his progress (Tr. 137–145). Plaintiff was placed in the lowest academic EMH math class (Tr. 137). He got along well with the other students although his conversation with his peers was extremely limited. Ms. Wood indicated that he functions better in an individual rather than a group setting, although his attention span in a one-on-one situation was only 3–5 minutes (Tr. 138). Plaintiff had little difficulty adjusting to the surroundings at school, but he was often late for class. His work in math was well below that of the average 11-year old sixth graders (Tr. 141). Ms. Wood felt that his lack of recall and long-term memory reduce his ability to apply mathematical skills for functioning in society (Tr. 143). She concluded that she saw no appreciable improvement in his math skills during the trial period in the EMH program (Tr. 144).